PETITION OF THE DEPARTMENT OF PUBLIC WELFARE TO
DISPENSE WITH CONSENT TO ADOPTION.

Middlesex. January 7, 1981. — May 7, 1981.

Present: HENNESSEY, C.J., WILKINS, LIACOS, & ABRAMS, JJ.

*Adoption*, Dispensing with parent's consent. *Department of Public Welfare. Minor*, Custody. *Words*, "Unfit."

Absent voluntary agreement, the Department of Public Welfare may not remove a child from the custody of an incarcerated mother, pursuant to G. L. c. 119, § 23A, without first obtaining an appropriate court order by a petition brought under c. 119, §§ 23 (C) or 24. [581-584]

Although the Department of Public Welfare improperly applied G. L. c. 119, § 23A, to transfer custody of a child born to an incarcerated woman to the department automatically and without a hearing and was in part responsible for failing to provide the mother with actual notice of a subsequent temporary custody proceeding pursuant to c. 119, § 23 (C), any illegality in the department's attempt to obtain custody of the child did not require dismissal of its petition under c. 210, § 3, since the child was in the care of the department at the time the petition was filed and heard. [584-585]

Dismissal of a petition by the Department of Public Welfare to dispense with parental consent to the adoption of a child was not required on the grounds that the department, in its provision of services to the mother and the child, had violated its own regulations and failed to follow the statutorily declared policy of the Commonwealth to strengthen and encourage families where there was no indication that the department had acted in bad faith and where dismissal of the petition would neither resolve the errors previously committed, nor serve the interests of the parties, nor advance the interests of the child. [585-586]

Discussion of the parental unfitness standard to be applied in any proceeding by which the State seeks to terminate parents' rights to the custody of their minor children. [587-592]

Discussion of the standard of proof to be applied in any proceeding by which the State seeks to terminate parents' rights to the custody of their minor children. [592-593]

Where a judge in granting a petition under G. L. c. 210, § 3, to dispense with parental consent to adoption of a child failed to make expressly

the required finding of the mother's current unfitness, where his findings were not sufficiently specific and detailed and, in some instances, not supported by the record, and where it was not clear to what extent inappropriate factors may have motivated his ultimate conclusion, the case was remanded for further proceedings in which the parties should be given an opportunity to present new evidence. [593-594]

PETITION filed in the Probate Court for the county of Middlesex on May 24, 1978.

The case was heard by *Martin*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Mark V. B. Partridge* for the respondent.

*Scott A. Smith*, Assistant Attorney General, for Department of Public Welfare.

*Jinanne S. J. Elder & John Reinstein*, for Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

LIACOS, J. On April 22, 1980, a judge of the Probate Court rendered a judgment granting a petition brought by the Department of Public Welfare (department) to dispense with parental consent to the adoption of a minor child. See G. L. c. 210, § 3. The mother appealed, and we transferred the appeal here on our own motion. The judgment below being unsupported by adequate findings as to the fitness of the surviving parent, we reverse and remand for further proceedings.

The child, Shari, is now between five and six years old. Her mother, Brenda, was serving a prison term at the Massachusetts Correctional Institution at Framingham (MCIF) at the time of Shari's birth. Shari was "accepted" into the temporary custody of the Department of Public Welfare on December 19, 1975, pursuant to G. L. c. 119, § 23A. The department then placed Shari with foster parents (Mr. and Mrs. A). Brenda was released from MCIF in August, 1977, and was subsequently reincarcerated at MCIF on a new sentence in June, 1978.

On March 29, 1978, during the period Brenda was not incarcerated, Shari was ordered committed to the temporary custody of the department pursuant to G. L. c. 119, § 23 (C). On May 24, 1978, the department filed the instant petition to dispense with consent to adoption. Shortly thereafter Shari, then two and one-half years old, was placed in a pre-adoptive home with her present foster family (Mr. and Mrs. B). A hearing on the § 3 petition was held in April, 1980. The judge determined that removal of the child from her present family environment would be detrimental to the child's welfare. The judge made no express finding of current "unfitness" of the child's natural parent to care for the child.[1]

The main contention of the mother is that, under the Constitution of the United States and the relevant Massachusetts statutes as interpreted by our cases, her consent to adoption may not be dispensed with under G. L. c. 210, § 3, in the absence of an affirmative showing of current parental unfitness. In addition she contends that, whether the correct standard is parental "unfitness" or "best interests of the child," the department must meet this standard with a showing of proof beyond a reasonable doubt or by clear and

---

[1] The judge found in part: "a finding that Brenda was an unfit mother as of May, 1978 . . . is inescapable.

"[T]he court is of the opinion that Brenda has effectively reorganized her life and by any reasonable standards, ceteris paribus, could be deemed to be a fit mother upon her expected release from prison and marriage to her fiance . . . . She has had the benefit of just about every conceivable educational, vocational or rehabilitative program one could imagine.

" . . . .

"There is no question but that the best interests of Shari demand that she be allowed to be adopted by [her present foster parents]. To upset her ill-starred young life once more would be cruel and dangerous to her.

"Shari . . . is a stranger to Brenda and . . . has never really known Brenda as her mother.

" . . . .

"[I]f Shari is returned to Brenda or to Brenda's temporary surrogate, the long term effects on Shari could be devastating. . . . By any reasonable standard, Shari is entitled to the protection of a permanent and loving home environment, free of the instabilities and uncertainties which have plagued her early years."

convincing evidence; that the department obtained custody of Shari unconstitutionally, and therefore there is no legal basis to bring the G. L. c. 210, § 3, petition; and that violations by the department of its own regulations constitute grounds for denying the petition.

The events leading to this appeal are as follows. Brenda was born in North Carolina on April 18, 1951. She became involved with heroin when she was twenty-one or twenty-two years old. In September, 1975, then pregnant with Shari, she was sentenced to MCIF for a drug-related offense. Brenda was eligible for parole in March, 1976. A department worker, Jane Briggs, interviewed Brenda prior to Shari's birth to discuss a short-term placement for the child. Brenda indicated her preference that Shari be placed with a member of her extended family in Springfield, most preferably with her aunt, Mrs. S, or, if that were not possible, with a black foster family. Shari was born on December 13, 1975. On January 13, 1976, she was placed, against Brenda's wishes, with a white foster family (family A), chosen in part because they lived near MCIF.[2]

In March, 1976, Brenda was offered two options for parole at supervised drug rehabilitation programs; one, a nine- to twelve-month program beginning in March, at Women, Inc.; the other, a six-month program with a minimum prescribed forty-five day stay beginning in April, at the National Center for Attitude Change (NCAC), both in Boston. The department case worker, Ms. Briggs, recommended Women, Inc., because there Brenda could have

---

[2] The judge found that "Shari was placed with [family A] only after the Department had made every [reasonable] effort . . . to place Shari with [Mrs. S] or with any other member of Brenda's extended family," and that "no one of Brenda's extended family offered any realistic plan for their custody of Shari on any reasonable long term basis." These findings are disputed by the respondent as unsupported by the record. Mrs. S testified that she was never approached by anyone from the department prior to Shari's initial placement, and that she was at all times prepared to care for Shari until Brenda was released. The only reason that appears in the record for the department's decision not to place Shari with Mrs. S at the outset is that Mrs. S was working full time.

Shari with her after the first month and receive counseling in parenting skills as part of the program. However, due to the relative length of the programs, Brenda chose NCAC.[3]

While Brenda was incarcerated on her initial sentence, Ms. Briggs brought Shari for day long visits approximately once a month, three visits in all. Shari was left alone with Brenda during these visits.[4] Ms. Briggs terminated her work with the case prior to Brenda's parole in April, 1976. Unknown to anyone in the department Mr. and Mrs. A brought Shari to visit Brenda at NCAC every week or so.

Michele Benkis, Ms. Briggs' supervisor, took over the case in April, 1976. She first attempted to contact Brenda in June or July, but was unsuccessful. Brenda had left the NCAC program without authorization. The department had no contact with Brenda until October, 1976. Brenda's social worker at MCIF informed the department that Brenda's parole had been terminated and that Brenda now wanted visitation with Shari at MCIF. The new department worker on the case, Susan Marmarek, spoke to Brenda on October 28. Unaware of any visitation between Shari and Brenda since March of that year Ms. Marmarek conditioned any future visitation with Shari on Brenda's first demonstrating a commitment to being a good parent. Brenda enrolled at a parent training course at MCIF. A day long visitation took place on November 16, 1976. The visit went well. Requests were made by Brenda and others on her behalf for more frequent visitation, but no visit took

---

[3] Ms. Briggs testified to her disappointment at this choice because Brenda passed up the opportunity to have Shari with her and because she had shown no interest in rehabilitation. She felt Brenda showed no interest in receiving counseling for her drug problem and it was not apparent to her that Brenda's life would change upon release. Ms. Briggs testified that her decision not to place Shari with Mrs. S upon Brenda's release in part reflected Mrs. S's concern, similar to her own, that Brenda might return to her previous life style and be unable to care for Shari.

[4] Ms. Briggs testified that in her opinion Brenda needed child development training. None was arranged, however. Ms. Briggs conceded that Brenda's skills improved over time.

place until January 21, 1977. Ms. Marmarek relinquished responsibility for the case shortly thereafter.

In February, 1977, Brenda entered the pre-release program at MCIF, a transition program involving outside work. Brenda worked as a receptionist and clerk. She had an excellent work record. Shari stayed with Brenda at the pre-release center every other weekend from late Friday through Sunday. The visits went well. In June, 1977, Brenda was returned to MCIF as a result of an on-the-job drinking incident during which she assaulted a correctional officer. During the next two months there were bi-weekly visits with Shari.

On August 27, 1977, Mr. and Mrs. A brought Shari for a scheduled visit, but discovered that Brenda had been paroled on August 24. The department worker then on the case, Marianne LeVert called Brenda's aunt, Mrs. S, to inquire about Brenda's whereabouts. Mrs. S told her Brenda was somewhere in Springfield. On October 4, 1977, Brenda called from a Howard Johnson's motel to request a weekend visit there with Shari. Based on the department's view of Brenda's past history and failure to contact the department sooner following her release, and based upon the department's lack of knowledge about Brenda's present life style, Ms. LeVert concluded that such a visit would be inappropriate. Ms. LeVert suggested that Brenda come to her office in Framingham to discuss Brenda's present plans and living situation before she could have Shari for a weekend visit. Brenda did not come to the office. Ms. LeVert, who left the case in October, had no further contact with Brenda, but in early November, 1977, Ms. LeVert recommended that the department file a guardianship petition in Probate Court as well as a G. L. c. 210, § 3, petition. Because Shari had been in foster care for almost two years, Ms. LeVert felt it was the department's responsibility to start making permanent plans for her. Ms. LeVert's recommendation was referred to the department's legal division for further action. Brenda was not advised that these steps had been taken.

383 Mass. 573                                              579

Petition of the Department of Public Welfare to Dispense with Consent to Adoption.

The department next heard from Brenda on December 8, 1977. The new department worker on the case, Judy Hurley, received a message that Brenda had called to arrange a visit. Not hearing further from Brenda, and unable to reach her directly, Ms. Hurley called Mrs. S. Brenda returned Ms. Hurley's call two days later on December 15. Brenda told her that from September through December she had no job and no money, so she had to "take to the streets," and that she was living with her boyfriend whom she was considering marrying. She gave Eunice S's address as her mailing address. It was agreed they would schedule visitation with Shari, but Brenda failed to call the next day as agreed. Brenda next called on December 20, but Shari was unavailable because she had bronchitis. A visit was then agreed upon for December 23. On the morning of the twenty-third, Ms. Hurley called Brenda to confirm the visit. Brenda wasn't sure she could make it and said she would call back. Brenda neither called back nor showed up for the visit.

Brenda next called in mid-January, 1978, to inform Ms. Hurley she had applied for general relief and hoped to apply for Aid to Families with Dependent Children when Shari was returned, and that she had switched drug counseling programs. A visit with Shari took place on January 31, 1978. It went well.

In January Ms. Hurley requested an independent investigation of Brenda's living situation as well as that of her extended family. Early in March, 1978, a department home finder, Cicely Quinn, did an assessment of Brenda's one-room efficiency apartment as well as the homes of Mrs. S, and that of a friend of Brenda, Delores F. She concluded that Brenda's apartment was too small and lacked a separate bed for Shari. In any event, the main focus of her discussion with Brenda involved placement of Shari with Brenda's extended family or Delores F. Although Ms. Quinn considered the homes of both Mrs. S and Delores F adequate placements, neither person was prepared to make a commitment to care for the child for longer than one year.

Ms. Quinn determined that Shari needed a permanent placement and recommended a search for an unrelated preadoptive foster family.[5]

In mid-March, 1978, the department tried to notify Brenda by registered mail sent to her apartment of the pendency of the guardianship petition. The letter was returned with the notation "Removed No Address." No attempt was made to contact Brenda through Mrs. S. The department obtained temporary legal custody of Shari pursuant to G. L. c. 119, § 23 (C), on March 29, 1978. Brenda's whereabouts remained unknown to the department until June, 1978. It was later revealed that Brenda was convicted in May, 1978, of assault and battery by means of a dangerous weapon and that she had earlier fled the State in an attempt to "avoid the law."

On May 24, 1978, the department filed the instant petition pursuant to G. L. c. 210, § 3, to dispense with Brenda's consent to Shari's adoption. Because Brenda's whereabouts were unknown, the citation was published but never served on her. On June 9, 1978, the department, after a thorough search for an adoptive black family, placed Shari with Mr. and Mrs. B, where Shari has resided since.

On June 28, 1978, the department was informed by a social worker at MCIF that Brenda had been returned there and wanted to see Shari. The department responded that no visitation would be permitted. Brenda did not receive formal notice of the legal change in Shari's custody pursuant to G. L. c. 119, § 23 (C), or of the department's intention to seek to terminate her parental rights until December, 1978. There has been no visitation between Brenda and Shari since January 31, 1978.

We turn now to consider the contentions of the parties.

---

[5] Both Mrs. S and Delores F testified to their willingness to take Shari as long as necessary until Brenda was able to take her. Ms. F testified that Ms. Quinn only mentioned figures up to a year and that she agreed to take Shari for that long, but that she never placed any time limit in the event of a placement.

1.  Brenda contends that the probate judge should have dismissed the department's petition because the department did not have legal custody of Shari.  In support of this contention Brenda argues that G. L. c. 119, § 23A, was unconstitutionally applied in this case because she was not afforded a hearing when the department first took custody of Shari, and that the later grant of custody, ex parte, to the department pursuant to G. L. c. 119, § 23 (C), was without proper notice to her.

General Laws c. 119, § 23A,[6] arguably mandates the automatic transfer of custody to the department, without a hearing, of all minor children born to incarcerated women.  So the department contends.  Thus viewed, it establishes an irrebuttable presumption that an incarcerated mother is unfit, or, as the department contends, unavailable.  The department contends that the statute is not unconstitutional because the presumed fact of unavailability is necessarily true for all incarcerated mothers.

Even tested against the assumption that incarcerated mothers are presumptively unavailable, the statute nevertheless fails to account for situations in which the father is available to care for the child, or those situations in which the mother may herself nominate a relative[7] or friend to care

---

[6] General Laws c. 119, § 23A, as appearing in St. 1966, c. 473, provides:  "Any child born to an inmate of the Massachusetts Correctional Institution, Framingham, or of the Industrial School for Girls at Lancaster, or of a jail or a house of correction, shall be accepted by the department, and any child whose mother is committed to the Massachusetts Correctional Institution, Framingham, to a jail or a house of correction, or to the custody of the youth service board, may be accepted by the department.  Thereupon the department in consultation with the commissioner of correction or the chairman of the youth service board shall make such provision at said place of commitment or elsewhere for the care of said child as may seem to be for the best interests of said child."

[7] In *Moore* v. *East Cleveland*, 431 U.S. 494, 504 (1977), the Supreme Court made clear that the constitutionally protected realm of family life "is by no means . . . limited to . . . the nuclear family."  The Court observed:  "Out of choice, necessity, or a sense of family responsibility, it has been common for close relatives to draw together and participate in the duties and the satisfactions of a common home.  Decisions concerning

for the child.[8]   In the absence of unfitness of such nominees
the State's interest to justify intervention on behalf of the
child is de minimis.  Cf. *Stanley* v. *Illinois*, 405 U.S. 645,
657-658 (1972) (striking down irrebuttable presumption of
unfitness of father of illegitimate child).   By apparently
foreclosing any timely judicial determination on the issue of
parental unfitness, the statutory presumption challenged
here "needlessly risks running roughshod over the important
interests of both parent and child."  *Id.* at 657.

Nevertheless, § 23A does serve a significant State interest
in protecting minor children.  The Legislature reasonably
could have concluded that the fact of a mother's incarcera-
tion signals a higher likelihood of a risk of danger to the
welfare of a newly born infant; but no specific language in
§ 23A requires an "automatic" loss of custody of a child
born to a mother then incarcerated, as the department con-
tends.[9]   It is also arguable that G. L. c. 119, § 23A, does

---

child rearing, which [have been] recognized as entitled to constitutional
protection, long have been shared with grandparents or other relatives
who occupy the same household — indeed who may take on major
responsibility for the rearing of the children.  Especially in times of adver-
sity . . . the broader family has tended to come together for mutual
sustenance and to maintain or rebuild a secure home life."  *Id.* at 505.
The Court further noted:  "*Prince* v. *Massachusetts*, 321 U.S. 158 (1944),
which spoke broadly of family authority as against the State, [is] a case
where the child was being reared by her aunt, not her natural parents."
*Id.* at 505 n.15.  Cf. G. L. c. 119, § 1.

[8] Under G. L. c. 119, § 21, "Custody" is defined to include the power
"to determine the child's place of abode, medical care and education."
Under the same section "Parent" is defined as "mother or father" or, by
express incorporation of the definition in G. L. c. 118, § 1, as appearing
in St. 1967, c. 658, § 27, as "stepfather, stepmother, stepbrother, step-
sister; *any blood relative*, including those of the half blood, except cousins
who are more distantly related than first cousins . . ." (emphasis added).

[9] We note, although we do not rely on this ground, that we have been
given no reason why an infant child cannot remain, at least part of the
time, with the incarcerated mother in the absence of a finding that the
mother is an unfit parent.  General Laws c. 119, § 23A, expressly con-
·templates the option of placing the child in the institution where the
mother is committed.  The record indicates that the respondent had her
own room in a cottage at MCIF.  Moreover, at least until enactment of

383 Mass. 573                                           583

Petition of the Department of Public Welfare to Dispense with Consent to Adoption.

not require removal of a child from an institution where the mother is incarcerated, but only requires the department to "accept" the child at the mother's request (cf. G. L. c. 119, § 23 [A]), or after a determination that the "best interests" of the child require it (cf. G. L. c. 119, §§ 23 [C], [D]). It is not necessary to reach this question to conclude that the important family interests involved preclude removal, absent voluntary agreement, without an appropriate court order. Additionally, if the mother presents a feasible plan for the child which does not threaten the welfare of the child — i.e., does not place the child in need of care and protection within the meaning of c. 119 — the department's function is limited to ascertaining whether the plan is implemented on the child's birth.

In the event the mother has no feasible plan, the department's function is to "direct its efforts, first, to the strengthening and encouragement of family life [, including the extended family,] for the protection and care of children [and shall] assist and encourage the use by any family of all available resources to this end." G. L. c. 119, § 1, as amended by St. 1972, c. 785, § 5. Thus, to the extent possible, the department is required to assist the mother to develop a plan which simultaneously protects the child and minimizes the prospect of an immediate or eventual breakup of the family. The department shall "provide substitute care . . . only when the family itself or the resources available to the family are unable to provide the necessary care and protection to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development."[10]  G. L. c. 119, § 1. If temporary substitute

---

§ 23A in 1958 a special facility was maintained at MCIF for incarcerated mothers and their infant and preschool age children. See 1958 House Doc. No. 3015, at 40-44. Indeed, the predecessor statutes to § 23A provided a scheme under which an infant child presumptively remained in the care of a capable incarcerated mother who desired to care for the child. See G. L. c. 127, §§ 95, 96, repealed by St. 1958, c. 588, § 1.

[10] Department regulations provide: "*Choice of Least Restrictive Alternative.* At every stage of the planning process, the worker shall search

care is deemed necessary the department may obtain custody of the child only through the statutory procedures designated in c. 119 as appropriate to the circumstances of the particular case. That is, the mother may elect to seek a temporary foster placement or an adoptive placement for the child.[11] See G. L. c. 119, §§ 23 (A), (B). However, in the event the department seeks a placement of the child which is against the wishes of the mother and which interferes in any way with her presumptive right to custody of the child — including the right to choose a caretaker proxy — the department must first petition the courts pursuant to G. L. c. 119, §§ 23 (C) or 24.

Our conclusion that G. L. c. 119, § 23A, was applied improperly in this case does not require dismissal of the department's petition. The probate judge, presuming the constitutionality of § 23A, expressly found: "Any informalities [*sic*] which might have occurred in the early stages of processing of the case by the Department are deemed to have been cured by the hearing [pursuant to G. L. c. 119, § 23 (C)] on March 29, 1978. The fact that Brenda was not available on such date is entirely due to the fact that Brenda was absent in an attempt to avoid the law." On March 13, 1978, "the Department had tried to reach Brenda by Registered Mail . . . which was returned with the notation 'Removed No Address' . . . ."

Brenda, however, contends that the temporary custody order relied upon to cure any defects in the earlier proceed-

---

for and encourage the selection of the least restrictive alternative which is in the interest of growth and health, and the eventual return of the youth to his or her family. . . ." 106 Code Mass. Regs. 230.440 (1979).

"*Presumption Against Separation of Child from Household.* Separation of the child from the household even temporarily as a means to attain Service Plan goals is an extraordinary measure that shall be considered only as a last resort . . . ." 106 Code Mass. Regs. 234.053 (1979).

[11] Mothers who elect to place their children in temporary foster care should be forewarned that their parental rights might be jeopardized in the event such a placement becomes prolonged. *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption,* 367 Mass. 631, 643-644 (1975).

ings is itself defective because it was obtained, she alleges, without providing her proper notice as required by G. L. c. 119, § 24, and the due process clause of the Fourteenth Amendment. Brenda claims the department was aware that she could have been reached at all times through Mrs. S and that the department was required to pursue this avenue of notice before holding a hearing in her absence.

We agree that the department was in part responsible for its failure to provide actual notice to Brenda. Initial legal steps to terminate Brenda's parental rights were taken within the department pursuant to the case worker's recommendation as early as November, 1977. Brenda was never informed. Rather, the department was still encouraging Brenda to believe that her plans to be reunited with Shari were being given serious consideration. Thus, there was a period of several months during which department workers had actual contacts with Brenda and could have advised her that the department planned legal action in the near future.

Nevertheless, the department's conduct in this regard does not require or justify dismissal of the department's petition. Under G. L. c. 210, § 3, a petitioner need not have custody of the child; rather § 3 confers standing to bring a petition on the department or on persons who have either custody *or care* of the child. Shari was in the care of the department at the time the petition under G. L. c. 210, § 3, was filed and heard. Thus, the department had standing to initiate such a proceeding.

2. Brenda argues next that the department's petition must be dismissed because the department violated its own regulations and failed to follow the statutorily declared policy of the Commonwealth to strengthen and encourage families. See G. L. c. 119, § 1; *Custody of a Minor* (1), 377 Mass. 876, 882 n.5 (1979). Specifically, the respondent alleges that the department (1) failed to place Shari with a member of the respondent's extended family (G. L. c. 119, § 1), (2) failed to place Shari in a geographically convenient foster home (106 Code Mass. Regs. 234.073 [1979]), (3) failed to encourage parental visits (106 Code Mass. Regs.

234.071 [1979]), (4) failed to send written reminders of opportunity to visit (106 Code Mass. Regs. 234.072 [1979]), and (5) failed to send notice of the prohibition of parental visits in 1978 (106 Code Mass. Regs. 234.071).[12]

The probate judge made no findings with regard to several of the points raised by the respondent, but he did make certain findings, which we need not detail, which exonerate the department. The respondent challenges these findings as not supported in the record. Although the department has undoubtedly made mistakes in its conduct of this case, we are unconvinced that the department's conduct has been "so arbitrary and irrational as to warrant a dismissal." *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 269 (1978). We see no indication that the department has not acted in good faith in furtherance of its mandate to protect the welfare of Shari. More significantly, we are not prepared to require dismissal of the department's petition to the possible detriment of the child because of mistakes the department may have made.

The present posture of this case and the very disparate characterizations of the facts by the parties underscore the need for judicial involvement from the outset. An early hearing would have provided a clear, contemporaneous record of the availability or nonavailability of an initial placement for Shari with a member of Brenda's extended family. Instead, the department apparently felt free to act, under G. L. c. 119, § 23A, frequently adversely to the respondent's wishes, and perhaps adversely to her rights, based upon its own perception of the facts and the law. But dismissal of the instant petition would neither resolve the errors committed nor serve the interests of the parties; nor would it advance the interests of the child. We turn, therefore, to a consideration of the substantive issues raised by the parties on this appeal.

---

[12] See also the regulations quoted at note 10 *supra*.

383 Mass. 573                                            587

Petition of the Department of Public Welfare to Dispense with Consent to Adoption.

3. *Parental rights.* Brenda argues that, as the surviving parent,[13] her consent to have Shari adopted may not be dispensed with under G. L. c. 210, § 3, absent an affirmative showing of current parental unfitness. She bases her argument on both the Federal Constitution and State law. Since we agree with Brenda's claim on the basis of State law, we need not explicitly consider her constitutional claims.[14] *Bezio* v. *Patenaude,* 381 Mass. 563, 576 n.10 (1980).

The resolution of any custody dispute involving a natural parent necessarily begins with the premise that parents have a natural right to the custody of their children. See *Custody of a Minor* (2), 375 Mass. 733, 747-748 (1978); *Richards* v. *Forrest,* 278 Mass. 547, 553 (1932); *Purinton* v. *Jamrock,* 195 Mass. 187, 199 (1907); *Wright* v. *Wright,* 2 Mass. 109, 110 (1806). At common law it was presumed that a child's welfare is best served in the care and custody of its parents. Cf. *Purinton* v. *Jamrock, supra* at 201. "'The rights to conceive and to raise one's children' are 'essential . . . basic civil rights of man . . . far more precious . . . than property rights.' . . . The interest of parents in their relationship with their children has been deemed fundamental, and is constitutionally protected" (citation omitted). *Department of Pub. Welfare* v. *J.K.B.,* 379 Mass. 1, 3 (1979), quoting from *Stanley* v. *Illinois,* 405 U.S. 645, 651 (1972).

However, the right of parents to be free from intrusion by the State in matters of childrearing is not absolute. *Custody of a Minor* (1), *supra* at 881; *Custody of a Minor* (2), *supra*; *Prince* v. *Massachusetts,* 321 U.S. 158 (1944). The State as parens patriae may act to protect minor children from serious physical or emotional harm. In some instances this

---

[13] Shari's father had died before the proceedings involved in this litigation began.

[14] We recognize that many of our decisions find their underpinnings not only in the statutes and common law of the Commonwealth but also rest partially on Federal constitutional considerations. Since our case and statutory law dictates the holding for which the mother argues, we see no need to go further and explore the full extent of Federal constitutional doctrine.

may require a partial or complete severance of the parent-child relationship. In such matters "the first and paramount duty of courts is to consult the welfare of the child. To that governing principle every other public and private consideration must yield." *Richards* v. *Forrest, supra* at 553. "[W]here a child's well-being is placed in issue, 'it is not the rights of parents that are chiefly to be considered.'" *Custody of a Minor* (2), *supra* at 749, quoting from *Purinton* v. *Jamrock, supra* at 199. Although "[p]arents are the natural guardians of their minor child and entitled to its custody . . . [t]heir right will not be enforced to the detriment of the child." *Richards* v. *Forrest, supra.*

In considering the welfare of the child we have acknowledged the principle that a child's interest is best served in a stable, continuous family environment. See *Custody of a Minor* (1), *supra* at 882. Although this principle is not easily susceptible of empirical proof, there exists a "substantial and impressive consensus" among experts in the field of child development that "disruption of the parent-child relationship carries significant risks" for the child. Mnookin, Child-Custody Adjudication: Judicial Functions in the Face of Indeterminacy, 39 Law & Contemp. Prob. 226, 265 (Summer 1975), and cited authorities. See Comment, Alternatives to "Parental Right" in Child Custody Disputes Involving Third Parties, 73 Yale L.J. 151 (1963); Ellsworth & Levy, Legislative Reform of Child Custody Adjudication, 4 Law & Soc. Rev. 167 (1969); Developments — The Family, 93 Harv. L. Rev. 1156, 1320 (1980); Strauss & Strauss, Book Review, 74 Colum. L. Rev. 996, 997-999 (1974); Wald, State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children from their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights, 28 Stan. L. Rev. 625, 644 (1976). See, e.g., J. Goldstein, A. Freud, & A. Solnit, Beyond the Best Interests of the Child 31-34 (1973); J. Bowlby, Attachment and Loss (1969). See also *Adoption of Tachick*, 60 Wis. 2d 540, 554 n.9 (1973), collecting authorities.

Recognition of the primacy of parental rights and the child's need for stability and continuity has led us to the

general proposition that "the Commonwealth may not attempt to force the breakup of a natural family without an affirmative showing of parental unfitness." *Custody of a Minor* (1), *supra* at 882. Judges are required to exercise "utmost care" in making custody determinations. The "necessity" of removing the child from his or her parents must be "persuasively shown." *Id.* at 886. It is now clear that the unfitness standard must be applied whenever the State seeks to terminate parents' rights to the custody of their minor children, whether the State proceeds under the care and protection statute (G. L. c. 119, §§ 23-29), the guardianship statute (G. L. c. 201, § 5), or the adoption statute (G. L. c. 210, § 3). See *Bezio* v. *Patenaude, supra* at 570-571 (G. L. c. 201, § 5); *Custody of a Minor* (1), *supra* at 880 (G. L. c. 119, § 24); *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 265 (1978) (G. L. c. 210, § 3).

Significantly, however, the term "unfitness" signifies something more than a standard by which we measure the limits of acceptable parental conduct. The term is a standard by which we measure the circumstances within the family as they affect the child's welfare. "[T]he critical question is whether the natural parents are currently fit to further the welfare and best interests of the child." *Bezio* v. *Patenaude, supra* at 576. In *Richards* v. *Forrest, supra* at 553-554, we stated: "It is conceivable that certain parents might be fit to bring up one child and unfit to bring up another. In this connection the welfare of the child is important. . . . The unfitness of parents . . . must be determined with respect both to their own character, temperament, capacity, and conduct, and to the welfare of the child in connection with its age, environment and affections." In *Wilkins* v. *Wilkins*, 324 Mass. 261, 262 (1949), we explained: "In determining whether parents are unfit, the most important consideration is whether the welfare of the child would be served by custody in them or in a guardian." In *Adoption of a Minor*, 343 Mass. 292, 296 (1961), quoting from *Adoption of a Minor*, 338 Mass. 635, 643

(1959), we observed: "When a child is placed . . . in a good family the inevitable consequence will be that firm bonds of affection and confidence will rapidly arise on both sides. The damage to the child . . . from breaking these bonds is something which even competent psychiatrists may be unable to predict. In the absence of compelling statutory command, such a breach should not be permitted lightly at the request of either of the natural parents . . . . The interests of the natural parents in such a case must be completely subordinated to the permanent interest of the child."

These cases and others stand for the proposition that "if returning custody to the natural parents would be seriously detrimental to the welfare of the child, then the parents could be considered to be unfit ('unsuitable, . . . not adapted for a particular use or service,' . . .)" (citations omitted). *Bezio* v. *Patenaude, supra* at 575, quoting from *Wilkins* v. *Wilkins, supra* at 262-263. See *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 371 Mass. 651 (1976); *Kauch, petitioners,* 358 Mass. 327 (1970) *Duclos* v. *Edwards,* 344 Mass. 544 (1962); *Stinson* v. *Meegan,* 318 Mass. 459 (1945); *Gordon* v. *Gordon,* 317 Mass. 471 (1945).[15] Thus, natural parents may not be deprived of the custody of their minor children in the absence of a showing that they "have grievous shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard," or "unless some factor such as lengthy separation and a corresponding growth in the ties between the child and the prospective adoptive parents indicate[s] that the child would be hurt by being returned to the natural parents." *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption,*

---

[15] In several of these cases, as well as in *Richards* v. *Forrest,* 278 Mass. 547 (1932), the court reversed the Probate Court and ordered the child returned to its natural parent(s) after a long separation, despite a finding by the probate judge that it would be harmful to the child to sever the emotional bonds between the child and the long-term caretakers. The court did not focus on the quality or character of parental conduct, but rather on its view of the long-term welfare of the child.

383 Mass. 573 591

Petition of the Department of Public Welfare to Dispense with Consent to Adoption.

367 Mass. 631, 639, 642, 646 (1975). We believe that this is the appropriate standard for cases of this type.[16] The language of G. L. c. 210, § 3 (c), seems to us consistent with this view.[17] The standard we have articulated requires a finding of parental "unfitness" before the State may deprive a natural parent of custody of her child. We have observed more than once that "[n]either the 'parental fitness' test nor the 'best interests of the child' test is properly applied to the exclusion of the other. . . . [The two tests] 'reflect different degrees of emphasis on the same factors . . . . [T]he tests are not separate and distinct but cognate and connected.'" *Bezio* v. *Patenaude, supra* at 576-577, quoting from *Little Wanderers, supra* at 641.

Clearly, under the test our cases articulate, the State may not deprive parents of the custody of their children merely because they are poor and cannot offer the child certain material advantages, or because they choose or suffer an unusual life style. It is not the quality or character of parental conduct per se that justifies State intervention on behalf of an abused, neglected, or otherwise endangered

---

[16] We emphasize that we do not recognize a per se rule that prospective adoptive foster parents, who have become a minor child's psychological parents, shall automatically prevail in a custody dispute over a natural parent. We are not unaware of the existence of a significant body of legal commentary that urges such an approach. See, e.g., Mnookin, Child-Custody Adjudication: Judicial Functions in the Face of Indeterminacy, 39 Law & Contemp. Prob. 226, 282-283 (Summer 1975); J. Goldstein, A. Freud, & A. Solnit, Beyond the Best Interests of the Child (1973); Comment, Alternatives to "Parental Right" in Child Custody Disputes Involving Third Parties, 73 Yale L.J. 151, 163, 165-166 (1963). Other commentators would recognize psychological parents as prima facie entitled to custody. See, e.g., Foster & Freed, Child Custody (Part II), 39 N.Y.U.L. Rev. 613, 628 (1964), endorsing 1963 A.B.A. Family Law Section adoption of such a rule.

[17] General Laws c. 210, § 3 (c), as appearing in St. 1972, c. 800, § 2, reads in part: "In determining whether the best interests of the child will be served by issuing a decree dispensing with the need of consent as permitted under paragraph (b), the court shall consider the ability, capacity, fitness and readiness of the child's parents or other person named in section two of chapter two hundred ten to assume parental responsibility, and shall also consider the plan proposed by the department or other agency initiating the petition."

child. Rather, it is the fact of the endangerment itself. As parens patriae the State does not act to punish misbehaving parents; rather it acts to protect endangered children. *Custody of a Minor*, 5 Mass. App. Ct. 741, 747 (1977), citing *Hersey* v. *Hersey*, 271 Mass. 545, 555 (1930), and *Stevens* v. *Stevens*, 337 Mass. 625, 627 (1958).

4. *Standard of proof.* The respondent contends that due process requires that the State prove the necessity for termination of parental rights "beyond a reasonable doubt" or at least by "clear and convincing" evidence. We have rejected similar contentions in the past. See *Custody of a Minor* (3), 378 Mass. 712, 720-722 (1979); *Custody of a Minor* (1), 377 Mass. 876 (1979). We are not at this time persuaded otherwise. Cf. *Guardianship of Roe, ante* 415 (1981).

We have previously recognized that custody determinations involving the possible breakup of a family implicate important parental rights and warrant an extra measure of evidentiary protection. *Custody of a Minor* (1), *supra* at 884. In addition, however, we recognized that such determinations also affect the interests of the child, "whose welfare might significantly be jeopardized by requiring a more onerous burden of proof." *Custody of a Minor* (2), *supra* at 721.

In rejecting the use of the "clear and convincing" standard we observed that this standard may in practice function as the equivalent of the more strict "reasonable doubt" standard. Thus, eschewing the use of either standard, we concluded that "the personal rights implicated in proceedings of this character require the judge to exercise the utmost care in promulgating custody awards. Such care, in our view, demands that the judge enter specific and detailed findings demonstrating that close attention has been given the evidence and that *the necessity of removing the child from his or her parents has been persuasively shown*" (emphasis added). *Custody of a Minor* (1), *supra* at 885-886. We perceive no appreciable difference between the requirements that a showing be clear, convincing, or persuasive. Our use of the term persuasive in the past was designed to

383 Mass. 573 593

Petition of the Department of Public Welfare to Dispense with Consent to Adoption.

underscore the distinction between the appropriate level of proof and proof "beyond a reasonable doubt." We believe that the requirement of a persuasive showing, coupled with the high degree of harm that must be demonstrated, adequately protects parental rights under G. L. c. 210, § 3, while not unduly burdening the ability of the State to act.

5. We now test the judge's findings and rulings against the guidelines we have set forth. The judge failed to make expressly the required finding that Brenda is currently unfit, although his ruling may arguably be read as tantamount to such a finding. Nevertheless, this failure suggests some uncertainty on the judge's part regarding the appropriate legal standard.[18] Moreover, his findings are not sufficiently specific and detailed. Several of the judge's findings are not supported by the record. In addition, it is not entirely clear to what extent certain inappropriate factors may have motivated the judge's ultimate conclusion. For example, the judge observed that "the B family . . . would be cruelly and unjustifiably hurt if Shari were to be summarily snatched from their home." Finally, the crucial finding that "if Shari is returned to Brenda . . . the long term effects on Shari could be devastating, according to the believable and impressive testimony of the psychiatrist," is deficient in several respects. Wholesale incorporation of the psychiatrist's testimony in the absence of specific and detailed findings by the judge makes it impossible for us to ascertain whether the judge has given close attention to the evidence and arrived at an independent judgment based upon that evidence, or whether the judge is simply rubberstamping the conclusion of the expert witness. Additionally, we have found no opinion in the testimony of the psychiatrist that the "long term effects on Shari could be devastating," nor is there such evidence elsewhere in the record.

As there has been a substantial passage of time since the last hearing in this matter and the circumstances of the par-

---

[18] We note that the hearings involved in this proceeding occurred prior to our decision in *Bezio* v. *Patenaude*, 381 Mass. 563 (1980).

ties may have changed, the parties shall be given an opportunity to present new evidence. *Bezio* v. *Patenaude, supra* at 579. The respondent's visitation rights should be reinstated immediately and a visitation schedule established and continued until final determination of this case, unless it is determined by the court that such visitation will be, or is, a serious threat to the welfare of the child. It may be appropriate to hold a preliminary hearing to determine whether, through a gradual program of increased visitation, it would be feasible to return Shari to her natural mother without serious adverse effect, assuming, of course, that the respondent now appears to be otherwise fit. Such visitation, with expert monitoring if deemed desirable, even if unsuccessful toward reuniting mother and daughter, might help to establish evidence on the ultimate issue of current fitness.

We therefore reverse and remand the case for further proceedings consistent with this opinion.

*So ordered.*