LAWRENCE FORT *vs.* LOUISE L. FORT
(and a companion case).

Middlesex.   March 30, 1981. — September 11, 1981.

Present: ARMSTRONG, PERRETTA, & DREBEN, JJ.

*Divorce and Separation,* Custody of child.

In a divorce action, an award of custody of a minor child to his father was
    not precluded by the father's cohabitation with an unmarried woman;
    although the effect of the father's living arrangements on the child was
    a relevant consideration in determining custody, the moral or criminal
    character of the cohabitation was properly found immaterial in the
    absence of evidence showing it had an adverse effect on the child.
    [413-419].

COMPLAINTS for divorce filed in the Middlesex Division of
the Probate and Family Court Department on May 18,
1979, and September 24, 1979, respectively.

The cases were heard by *Leahy,* J., on a master's report.

*Thomas J. Urbelis* for Louise L. Fort.

*David G. Stern* for Lawrence Fort.

ARMSTRONG, J.   On cross complaints of the husband and
wife for divorce, judgments were entered which dissolved
the marriage, made provision for alimony and equitable di-
vision of assets, and awarded custody of the two minor chil-
dren to the husband.   The only matter at issue in this appeal
is the wife's contention that the judge erred in awarding
custody of the youngest child, now eight years old, to the
husband, who is cohabiting with an unmarried woman.
Whether such a living arrangement should preclude an
award of custody to the offending parent, and, if not, the
significance, if any, which should be assigned to that factor
in determining custody, are questions which have been pre-
sented in this and at least three other cases argued during

the court year just concluded. See *Bouchard* v. *Bouchard, post* 899 (1981); *Kelly* v. *Kelly, post* 937 (1981); *Davisson* v. *Davisson, post* 420 (1981).[1]

The facts of the present case were found by a master and will be recounted only briefly. The parties are in their mid-forties. They were married in 1959 and had three children: a girl, born in 1961, who now attends college and treats the father's home as her home when college is not in session; a son born in 1963, who is a boarding student at a private secondary school and who, by his preference and with the agreement of the parties, lives with the father when school is not in session; and a second son, Edward, who was born in 1973, around whose custody the dispute centers.

The husband's successful business career has demanded long hours and caused him to be away from home for extended periods of time. The job of housekeeping and child-rearing fell almost exclusively to the wife. Nothing in the record suggests that she was not a concerned and conscientious parent, but she appears to have fallen into conflicts of a deep seated nature with the daughter and, to some extent, the older son. The master found that the children perceive a preference on her part for the younger son, and for both sons over the daughter. Her discipline has sometimes expressed itself in inappropriate acts of corporal punishment and acts and words that could only result in the humiliation and emotional estrangement of the children. No purpose would be served by citing particulars; on the basis of so much of the evidence as has been furnished to us (the order of reference, untypically, required the evidence to be reported), we have concluded that the master's findings, adopted by the judge, that the wife's volatile behavior has been a source of upset and polarization within the family for many years, that it has been a source of mental and emo-

---

[1] The question presented by these cases involves an *on-going* extramarital relationship. It is settled that a *terminated* extramarital relationship does not preclude an award of custody. See *Haskell* v. *Haskell*, 152 Mass. 16 (1890).

tional disturbance to the family members, and that the husband, by contrast, has a steady, even temperament well suited to the emotional needs of the children, are not without support in the evidence.

The master found that the "precipitating cause" of the separation of the parties was the husband's involvement with a twenty-five year old woman who was formerly an employee at his place of business. He commenced sexual relations with her shortly before he left the marital home in Sudbury in April, 1979, when he moved with her into an apartment in Winchester, still their home at the time of the trial. She was married when the relationship commenced but was divorced in September, 1979.

At the time of the master's report the wife had custody of Edward. It was the husband's hope, if he were awarded custody, to move to a larger apartment or house where he, the woman, and the three children could live together. Because of the woman's job, some arrangement would have to be made for Edward's care by day until he was old enough to go to boarding school. The master found that "there was no testimony that either the separation or [the woman's] presence has adversely affected any of the children, as there is evidence that the wife's conduct over many years has adversely affected the children . . . ."

The judge adopted the master's report and followed his recommendation in awarding custody of Edward to the husband. The wife appealed. Her motion to stay the judgment nisi was denied. The wife was to have custody of Edward to August 25, 1980. We assume the husband has had custody since that time.

The wife relies primarily in this appeal on a much-discussed Illinois case, *Jarrett* v. *Jarrett*, 78 Ill. 2d 337 (1979), cert. denied, 449 U.S. 927 (1980). There, the trial court had granted a divorce, awarding custody of the three minor children (12, 10 and 7) to the wife. Several months later the wife's boyfriend moved into the house, and the husband petitioned for a modification of custody for that reason. The trial court modified its judgment, transferring custody to

the husband. The Illinois Appellate Court reversed, holding that it was improper to conclude that the wife's cohabitation "constitutes such a disregard for community standards as to endanger her children's moral well-being" in the absence of more specific evidence that the relationship was "having a negative effect on the children." *Jarrett* v. *Jarrett*, 64 Ill. App. 3d 932, 936-937 (1978). The Illinois Supreme Court reversed by a split decision, holding that the exemplary effect on the children of the mother's continuing conduct in violation of Illinois statutes justified the change of custody. Here the conduct of the custodial parent is the same and is in apparent violation of three Massachusetts statutes: G. L. c. 272, § 16 (lewd and lascivious cohabitation, a felony); G. L. c. 272, § 14 (adultery, a felony, applicable until the expiration of both nisi periods); and G. L. c. 272, § 18 (fornication, a misdemeanor, applicable when both divorces are absolute). In this case, as in the *Jarrett* case, there is no question that either of the natural parents is "unfit," as used in G. L. c. 201, § 5.[2]

We assume at the outset that there can be cases in which a court may take into account in determining custody the

---

[2] Two recent cases bear a superficial similarity to the present case but, because they differ in a fundamental respect, are not dispositive. In *Bezio* v. *Patenaude*, 381 Mass. 563 (1980), the Supreme Judicial Court held that a mother who practiced an openly homosexual life style could not, for that reason alone, be denied custody of her child absent a finding based on evidence that her behavior adversely affected the child. The same approach was taken in *Petition of the Dept. of Pub. Welfare*, 383 Mass. 573 (1981), where the mother had been convicted of a crime and was a prisoner in a State correctional institution. In each case the litigants were a natural parent on the one hand and an unrelated custodian or agency on the other, and at issue was a cut-off of the parental rights of the natural parent. Such a cut-off was held to require a "persuasive" showing of unfitness of the natural parent and a "high degree of harm" to the child, demonstrated by "specific and detailed" findings. *Id.* at 592-593. Here, of course, we are faced with a custody dispute *between* natural parents. Parental rights are not threatened with cut off, as the noncustodial parent will generally be given rights of visitation. And because parental rights will not be cut off, a custody dispute between divorced parents lacks some of the constitutional overtones present in the unfitness cases. *Bezio* v. *Patenaude*, 381 Mass. at 570 n.6, quoting from *Custody of a Minor (No. 1)*, 377 Mass. 876, 882 (1979). *Petition of the Dept. of Pub. Welfare*, 383 Mass. at 587-588.

moral fitness or character of a proposed custodian as a fac-
tor bearing on the best interests and well-being of the child.
Such cases will, however, be relatively unusual. Our courts
must serve a society comprised of groups that are widely
disparate in cultural background and moral and religious
outlook. The judges who must ultimately determine dis-
putes over custody have the same disparities of outlook as
the society they serve. Obviously the individual judge can-
not hold up his own moral and religious views as the stand-
ard against which he determines the moral fitness of the
proposed custodian, for different judges would make con-
flicting determinations, and "the judicial branch of govern-
ment, with respect to [custody disputes], would become a
government of men and not of laws." *Reddington* v. *Red-
dington*, 317 Mass. at 765. Thus, in the usual case, judges
should avoid making moral judgments on the life-styles of
proposed custodial parents, recognizing that such judg-
ments are appropriate only when it can be shown that a
parent's life-style has a direct and articulable adverse impact
on the child, or where there can be no real dispute in the cir-
cumstances of the particular case that the behavior of the
custodial parent is related to his or her parenting ability.

What, then, of the fact that the life-style of the husband in
this case is in admitted and continuing violation of certain
of the criminal statutes mentioned above?[3] Does that fact

---

[3] Some courts have reached a conclusion that statutes which prohibit
specified sexual acts violate a right of privacy guaranteed by the Federal
Constitution when applied to private behavior between consenting
adults. See, e.g., *People* v. *Onofre*, 51 N.Y. 2d 476, 488 (1980); *State* v.
*Saunders*, 75 N.J. 200, 213-216 (1977); *State* v. *Pilcher*, 242 N.W. 2d 348,
356-359 (Iowa 1976). Other courts have reached a contrary conclusion.
See *Doe* v. *Commonwealth's Attorney for Richmond*, 403 F. Supp. 1199
(E.D. Va. 1975), aff'd, 425 U.S. 901 (1976), and authorities cited; *Johnson*
v. *San Jacinto Jr. College*, 498 F.Supp. 555, 573-576 (S.D. Tex. 1980); *Dix-
on* v. *State*, 256 Ind. 266, 269-271 (1971); *Kelly* v. *State*, 45 Md. App. 212,
215 (1980); *State* v. *Elliott*, 89 N.M. 305, 306 (1976); *State* v. *Santos*, 413
A.2d 58, 68 (R.I. 1980). See also *Carey* v. *Population Serv. Intl.*, 431 U.S.
678 (1977), in which several of the Justices indicated their view that a State
may constitutionally forbid extramarital sexual relations (White, J., con-
curring at 702; Powell, J., concurring at 703; Rehnquist, J.,

lift the case out of the realm where a judge must avoid moral judgment and make appropriate a consideration of the more speculative impacts, such as the moral example and the possibility of ridicule or humiliation?

The answer to that question must turn largely on a fact that we feel we can appropriately notice from our own collective judicial experience: namely, that the crimes of fornication, adultery, and lewd and lascivious cohabitation are never, or substantially never, made the subject of prosecution. We are not speaking here of a condition of merely sporadic enforcement, explainable, perhaps, by limited police resources or difficulties in securing evidence. We are speaking of an apparent consensus among law enforcement officials that such behavior is best not proceeded against criminally. Except for traffic offenses, it is difficult to think of any crimes of which evidence comes to the attention of law enforcement officials with greater regularity, whether through divorce actions which are based on, or otherwise concern, marital infidelities; paternity suits;[4] prosecutions

dissenting at 718 n.2), and the plurality opinion (by Brennan, J.) stated (at 694 n.17) that "the Court has not definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating [private, consensual sexual] behavior among adults." Some cases have interpreted *Commonwealth* v. *Balthazar*, 366 Mass. 298 (1974), as having enunciated a principle that private, consensual sexual behavior between adults is constitutionally protected. See, e.g., *Commonwealth* v. *Manning*, 367 Mass. 605, 613 (1975); *Commonwealth* v. *McKenzie*, 368 Mass. 613, 619 (1975) (Braucher, J., concurring). The *Balthazar* case itself stated, "We do not decide whether a statute which explicitly prohibits specific sexual conduct, even if consensual and private, would be constitutionally infirm," 366 Mass. at 302; and two other recent cases tend to suggest that our laws prohibiting fornication, adultery and cohabitation are valid and enforceable. See *Green* v. *Richmond*, 369 Mass. 47, 50-52 (1975); *Commonwealth* v. *Sefranka*, 382 Mass. 108, 116-117 (1980). The question of the constitutional validity of the statutes prohibiting fornication, adultery and lewd and lascivious cohabitation has not been argued in this case, and we intimate no view as to the answer, assuming, as do the parties, that the three statutes are valid.

[4] See G. L. c. 273, § 12, as appearing in St. 1977, c. 848, § 5, and G. L. c. 273, § 15, as amended by St. 1979, c. 621, § 2; *Commonwealth* v. *MacKenzie*, 368 Mass. 613 (1975); *Commonwealth* v. *Fanciullo*, 11 Mass. App. Ct. 64 (1980).

for rape (in the traditional sense[5]), where the defendant asserts consent; public assistance programs which aid unmarried mothers; publicly administered child protection and adoption programs; publicly funded abortions; or tort actions for alienation of affections or criminal conversation (*Doe* v. *Doe*, 378 Mass. 202 [1979]). Despite widespread official knowledge of such violations, prosecutions by law enforcement officials are essentially nonexistent. Particularly noteworthy are the cases where a person prosecuted for rape admits intercourse and alleges consent. Juries are regularly instructed that, if they have not been satisfied beyond a reasonable doubt that the complainant did not consent, they must return a verdict of not guilty. So far as we are aware no prosecutor has requested, and no judge has given, an instruction on fornication as a lesser included offense (compare *State* v. *Saunders*, 75 N.J. 200 [1979]), much less instituted a separate prosecution based on the defendant's admissions. See G. L. c. 208, § 45, a little-used (if ever used) statute, providing for notification by the court to the district attorney where divorce is granted for a cause constituting a crime. It seems beyond dispute that the statutes defining or punishing the crimes of fornication, adultery, and lewd and lascivious cohabitation have fallen into a very comprehensive desuetude.

To recognize that fact is not to say that those statutes have become invalid or judicially unenforceable. See 2 Sands, Sutherland Statutory Construction § 34.06 (4th ed. 1973).[6] *District of Columbia* v. *John R. Thompson Co.*, 346 U.S. 100, 113-114 (1953). For purposes of decision we assume the op-

---

[5] I.e., before the revision of the rape and rape-related statutes by St. 1974, c. 474. See *Commonwealth* v. *Gallant*, 373 Mass. 577, 583-585 (1977).

[6] Prosecutions may, however, run afoul of equal protection limitations on selective enforcement. Compare *People* v. *Acme Mkts.*, 37 N.Y. 2d 326, 330-331 (1975), with *United States* v. *Elliott*, 266 F. Supp. 318, 324-325 (S.D.N.Y. 1967). See generally *Oyler* v. *Boles*, 368 U.S. 448, 454-456 (1962); *Commonwealth* v. *King*, 374 Mass. 5, 19-20 (1977); Annot. 95 A.L.R.3d 280 (1979).

posite is true.[7]  But the trial judge was confronted in this
case not with a criminal prosecution under one of those stat-
utes, but with the question of what effect, if any, should be
given to the husband's violation of those statutes in the con-
text of a custody dispute, where the pivotal determination is
what custodial arrangement will serve the best interests of
the child.  The trial court should not approach that deter-
mination in a highly technical or overly legalistic manner.
The determination of custody is a choice among limited al-
ternatives, all of which, invariably, have imperfections,
often serious imperfections.  The judgment that is called for
is a realistic, commonsense judgment, one which weighs the
practical significance of those imperfections or deficiencies
in terms of their effect on the well-being of the child and his
future development.  Evaluated in terms of practical effect,
a criminal statute which is wholly ignored is the same as no
statute at all.  It follows that it is immaterial that the hus-
band's behavior violates those criminal statutes.  The judge
should instead evaluate the significance of the husband's
behavior in the same way that he would if the statutes were
removed from the books:[8]  that is to say, in terms of the in-
terpersonal relationships of the persons involved as they af-
fect the well-being of the child or children whose custody is
under consideration.

The master's findings adopted by the judge in the case be-
fore us properly did not find relevant the moral or criminal
character of the husband's living arrangement in the ab-

---

[7] See note 3, *supra.*

[8] In *Bouchard* v. *Bouchard, supra,* the probate judge, in response to re-
quests of counsel, ruled that the father's behavior in cohabiting with a
divorced woman and her children violated the criminal laws of the Com-
monwealth, and the tenor of the findings and rulings read together sug-
gested that that conclusion was a principal factor in the ultimate decision
that the best interests of the child required that custody be transferred to
the mother, who lived alone.  We remanded the case for further findings
as to any specific adverse impact that might be suffered by the child from
that living arrangement and for findings comparing the advantages and
disadvantages of the alternative custodial arrangements proposed by the
respective spouses.

sence of evidence showing an adverse effect on Edward. The determinative focus was on a specific comparison between the husband's steady disposition and even temperament and the relative tranquility of his living arrangement, on the one hand, and the emotionally charged atmosphere often generated by the wife's interaction with her family. This was a proper basis for awarding custody of the youngest child to the husband. The two older children preferred to regard their father's home as theirs, and it is not unreasonable to think that the interests of the youngest child might be best served by minimizing the separation from his siblings. In sum, the findings are detailed and reflect proper and mature evaluation of the numerous factors to be considered in determining custody. There is no basis in the record for our thinking that the best interest of the youngest child may not have been appropriately assessed.

*Judgment affirmed.*