COMMONWEALTH *vs* LEWIS WRIGHT.

Suffolk. October 3, 1978. — December 1, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & ABRAMS, JJ.

*Constitutional Law*, Assistance of counsel. *Practice, Criminal*, Assistance of counsel, Capital case. *Attorney at Law. Conflict of Interest.*

A defendant whose attorney had previously assisted a principal trial witness in surrendering to the police was not deprived of his constitutional right to the effective assistance of counsel where the attorney did not actively promote the witness's interests or counsel her about what she should do, where the minimal contact he had with her was consistent with the defendant's interests, and where there was no showing that counsel had confidential information which inhibited his cross-examination of the witness. [727-734]

INDICTMENT found and returned in the Superior Court on May 10, 1976.

The case was tried before *Travers*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Clyde D. Bergstresser* for the defendant.

*Kevin Connelly*, Special Legal Assistant to the District Attorney (*Michael J. Traft*, Special Assistant District Attorney, with him) for the Commonwealth.

QUIRICO, J. This is an appeal from a conviction of murder in the second degree, in which the defendant argues essentially one issue. He claims that the conflict created by his lawyer's pretrial representation of a codefendant who ultimately became a principal trial witness for the

Commonwealth denied him the effective assistance of counsel. He also asks us to direct a verdict of guilty of manslaughter in the exercise of our powers under G. L. c. 278, § 33E. We hold that there was no violation of the defendant's constitutional right to effective assistance of counsel, and conclude that there is no occasion to grant any relief under § 33E. We affirm the judgment.

On the morning of March 15, 1976, Renee Tillery's apartment at 9 Warwick Street in Roxbury was damaged by fire. That evening about 8 p.m., the defendant Wright who had been living with Renee, Renee's sister Tijuanna, and William H. Kimbrough, Jr., a relative, were helping Renee to move some clothes from the burned apartment to her mother's house when they met Freddie Santos, Jr., Renee's fourteen year old half brother, on the street. Renee accused Freddie (hereinafter referred to by his nickname, Flicky, to distinguish him from his father, Fred Santos, Sr., the victim) of setting the fire. According to her, Flicky replied, "You know I have to do what my father tells me to do."

The whole group then went to the home of a neighbor of Renee's, who had seen someone go in the window of Renee's apartment prior to the time of the fire. While Wright, Tijuanna, and Kimbrough waited downstairs, Renee took Flicky up to this neighbor's apartment. The neighbor identified Flicky as the person who started the fire.

Renee, Tijuanna, Flicky, Wright, and Kimbrough then went to 601 Shawmut Avenue, Boston, where Flicky lived with his father Fred Santos, Sr., who was also the father of Renee. Santos opened the door to his apartment and all five went in. Renee accused her father of involvement with the fire, and they began to quarrel, the others joining in. Shortly thereafter, Wright stabbed Santos several times with a knife, wounding him on the arm, the leg, and chest. A stab wound to the chest was the cause of death.

Wright, who testified at the trial, did not deny that he had delivered the fatal wound, but claimed that he had

acted in self-defense after Santos attacked him with a kitchen knife. Flicky, Renee, and Tijuanna testified that Santos was unarmed and seated on a couch throughout the incident. Kimbrough was also indicted and tried for the same offense. He testified that he came out of the bathroom and saw Wright and Santos struggling, but that he did not see the victim with a knife. He did not corroborate Wright's claim of self-defense.[1]

After the stabbing, Renee, Tijuanna, Kimbrough, and Wright went to Renee's mother's house. Kimbrough testified he saw Wright washing blood off a knife while there. The Commonwealth attempted to introduce in evidence a knife Kimbrough had previously identified to the police as the murder weapon, but, because Kimbrough could not identify it from the witness stand, it was excluded.

1. *Defendant's Claim of Counsel's Conflict of Interest.* Wright first communicated with his lawyer, Henry E. Quarles, Jr., sometime between the March 15 date of the homicide and March 30, 1976, when, with Mr. Quarles's assistance, he surrendered to the police. Mr. Quarles represented Wright from then on through his arraignment, trial, conviction, and sentence, after which new counsel was obtained for purposes of appeal.

Renee also asked Mr. Quarles for assistance in surrendering to the police, after she learned on March 30 that Wright was about to surrender. Mr. Quarles told her that he was already representing Wright, and that, because of the possible conflict of interest, she would have to get another lawyer. He then suggested to her the name of another attorney. However, Mr. Quarles did agree to make the arrangements for Renee to turn herself in, and to that end he met with her at her mother's house on the morning of March 31. At that time, he informed her of the content of the statement Wright had given the police

---

[1] The witnesses directed in their descriptions of Kimbrough's part in the events, but all agreed he was unarmed and played a relatively minor role. He was acquitted by the jury.

the previous day, and he then accompanied her to the police station where she turned herself in. In Mr. Quarles's presence, Renee gave a statement to the police substantially corroborating Wright's statement that Santos had attacked Wright with a knife. This statement was completely inconsistent with Renee's eventual testimony at trial.

At trial, Renee testified as follows in response to questions put by the assistant district attorney: "Q. Now, were you represented by counsel when you went into the police station that time? A. Yes. Q. Who was your lawyer? A. Mr. Quarles." However, Mr. Quarles was never her attorney of record. Another attorney represented her after her indictment for murder in the first degree in May, 1976, and assisted her in obtaining a promise of probation in exchange for her testimony at trial.

Before the jury were empanelled, the defendants Wright and Kimbrough and their counsel were present at a conference at the bench. Among other matters, the judge raised the issue of any possible conflict which might result from Mr. Quarles's prior relationship to Renee and his representation of Wright. In remarks "address[ed] directly to the Defendant Wright," the judge discussed the matter as follows: "There is one matter that was brought to the Court's attention concerning the Defendant Wright's case, and these remarks I address directly to the Defendant Wright. Mr. Quarles indicated that he had discussed this matter with you, and it concerns the prospective witness and co-defendant, Renee Tillery. Mr. Quarles indicated that Renee Tillery had given statements that were inconsistent statements both favorable to the case of the Commonwealth and favorable to the Defendant's case. But, in particular, there was a statement given by Renee Tillery to Mr. Quarles. It was given to him at about—and I assume it was just prior to her actually surrendering herself to the authorities, or at the time she surrendered herself to the authorities.[2] That he

[2] The basis for this statement by the judge is nowhere made clear on the record, nor is there any evidence of the contents of any state-

told Renee Tillery that he was not acting as her lawyer, could not act as her lawyer, and that the reason was that he was the lawyer for Lewis Wright. And in the course of that statement, she said things which he reasonably anticipated he would use in the course of this trial if she testified as a witness, because there were statements that were inconsistent with what she said on other occasions. But the point that I want to bring to your attention, and which he says he discussed with you, is that of course he was one of the persons, or was the person that was engaged in this conversation with her, so that as this is brought out, he will naturally be making reference to the fact that one of the persons who was talking to her was himself. Now, it is conceivable that this could in some way restrict his ability to cross-examine and he tells me that he has discussed this matter with you and that you understand that. Is that so, Mr. Wright?" THE WITNESS: "Yes." THE JUDGE: "And knowing that, and knowing that it may place some limitations upon him, he indicates that you are agreeable that he should represent you at this trial." THE WITNESS: "Yes." THE JUDGE: "Now, is that right?" THE WITNESS: "Yes." THE JUDGE: "So that if there is anything about that, whether we can fully foresee it at this time or not, are you agreeable that he should act as your lawyer in this case?" THE WITNESS: "Yes, I do." THE JUDGE: "All right."

---

ment allegedly made by Renee to Mr. Quarles. Because Wright never moved for a new trial on the claim of ineffective assistance of counsel, the factual record relevant to that claim is very poorly developed. We could rule on the question of the alleged conflict of interest much more intelligently if the underlying factual questions concerning Wright's and Renee's relationships with Mr. Quarles had been thoroughly explored on the record. In a case such as this, where unresolved factual issues are critical to the ultimate legal conclusion, counsel would be well advised to move to resolve those issues in the trial court before rushing to present their claims to an appellate court. *Delle Chiaie* v. *Commonwealth*, 367 Mass. 527, 530 (1975). *Earl* v. *Commonwealth*, 356 Mass. 181, 183 (1969).

With this as background, we turn to analysis of Wright's claim that he was denied effective assistance of counsel. We start from the premise, recently reaffirmed in *Commonwealth* v. *Leslie, ante* 647, 651-652 (1978), that "if a genuine conflict of interest could be shown, the defendant would have a constitutional right under the Sixth and Fourteenth Amendments or art. 12 of our Declaration of Rights to avoid the judgment of conviction, and this without having to demonstrate actual prejudice. See *Commonwealth* v. *Bolduc*, 375 Mass. 530, 540-543 (1978), and authorities cited; *Holloway* v. *Arkansas*, 435 U.S. 475, 487-489 (1978)."

Viewing this record with scrupulous regard for the defendant's important right to an attorney who is loyal solely to him, we conclude that there was no conflict here. Mr. Quarles's representation of Renee, if any,[3] was only undertaken with the explicit proviso that his first loyalty was to Wright. Mr. Quarles never, so far as this record reveals, actively promoted Renee's interests nor counseled her about what she should do. The minimal contact he did have with her was completely consistent with his client Wright's interests since she gave the police a state-

---

[3] Despite Renee's testimony that Mr. Quarles was "her lawyer" at the police station, the record before us does not support her claim that an attorney-client relationship existed between them. In the case of *Manuel* v. *Salisbury*, 446 F.2d 453 (6th Cir. 1971) (per curiam), cert. denied, 405 U.S. 1046 (1972), the appellant consulted one attorney briefly after his arrest but then hired another attorney to represent him. When a partner of the first attorney became the prosecutor at the appellant's trial, the appellant claimed conflict of interest. The court, rejecting his claim, stated that there was no proof that the appellant had ever had a confidential, attorney-client relationship with the first attorney. "More need be established in the proof of a confidential relationship than that an attorney and a defendant 'discussed the facts surrounding' the alleged offense. *See generally* C.T. McCormick, Evidence 183-86 (1954 ed.)." *Manual* v. *Salisbury, supra* at 455. But cf. *State ex rel. Moran* v. *Ziegler*,     W. Va.     ,     (1978) (244 S.E.2d 550, 552 [1978]), where even "the appearance of an attorney-client relationship" between a defendant and a lawyer was held to disqualify that lawyer from acting as a private prosecutor in the defendant's case.

ment corroborating Wright's version of the homicide and his claim of self-defense. By the time Renee changed her story, Mr. Quarles no longer had any contact with her.

This then is not a case where an attorney or his firm *simultaneously* represented a defendant and a witness for the Commonwealth, so that loyalties would naturally be divided. *Commonwealth* v. *Geraway*, 364 Mass. 168, 173 (1973). The facts here are somewhat closer to those in *Commonwealth* v. *Smith*, 362 Mass. 782 (1973), where no conflict of interest was found from the fact that the defendant's attorney had earlier represented a Commonwealth witness at his trial on a different charge. The potential for conflict in the instant case, however, is, if anything, less than in *Smith*, for Mr. Quarles only took Renee to the police station, while the lawyer in *Smith* represented the witness through an entire trial and sentencing.

Nonetheless, the principle of the *Smith* case, that a defendant "might well be entitled to relief if there were a showing that [the attorney] was given confidential information by [the witness] that served to restrict his cross-examination of [the witness]" is applicable here. *Commonwealth* v. *Smith, supra* at 784. The defendant makes precisely that claim. He asserts that counsel failed to cross-examine Renee regarding statements favorable to Wright made by her to Mr. Quarles on or before March 31, 1976. But there was no offer of proof, nor any clear evidence on the record,[4] that such statements even existed; or, if so, what they contained; or whether they would in fact have been helpful to the defendant's case. The defendant also claims that Mr. Quarles's cross-examination was impaired by his reluctance to reveal his prior connection with Renee and his need to justify the ethics of his own behavior. Again, beyond the bare assertion, there is no offer of proof that this was so, or that the cross-examination of Renee would or should have been

---

[4] See note 2 *supra.*

any different if conducted by another lawyer. Mr. Quarles's role in taking Renee to the police station was in fact brought out by both sides.

This court has rejected the contention that conflict of interest automatically arises whenever one attorney represents "two persons accused, or likely to be accused, of participating in the same crime." *Commonwealth* v. *Adams*, 374 Mass. 722, 731 (1978). Although a defendant need not prove how he was prejudiced by the existence of a conflict, "the burden lies with [him] to prove, without relying on speculation, that a conflict existed." *Commonwealth* v. *Bolduc*, 375 Mass. 530, 541 (1978). Here, aside from the speculative assertion that Mr. Quarles might somehow have been hindered in his cross-examination by his prior contact with Renee, there is no proof of a conflict.[5] In fact, Mr. Quarles's cross-examination of Renee was vigorous and thorough, and fully brought out her prior inconsistent statements to the police.

In a case with a fact pattern almost identical to that in the instant case, the First Circuit also found no violation of the defendant's constitutional right to counsel. *United States* v. *Donatelli*, 484 F.2d 505 (1st Cir. 1973). In that case, on two occasions prior to Donatelli's trial, a codefendant named Scaduto approached Donatelli's lawyer seeking legal help. By the time of Donatelli's trial, however, at which Scaduto was a government witness, Scaduto had a different lawyer and had apparently ended any relationship with Donatelli's lawyer. Rejecting Donatelli's claim that his attorney suffered a disabling conflict of interest as a result, the court stated that "defendant cannot rely on speculative harm caused by speculative confidential information to show that he was deprived of his constitutional rights at trial." *United States* v. *Donatelli*, *supra* at 507. We agree with this admonition. Similarly,

---

[5] If the defendant has information probative, beyond speculation, of such a conflict, this opinion does not preclude him from presenting it to the trial court in the form of a motion for a new trial.

in *United States* v. *Alberti*, 470 F.2d 878, 881 (2d Cir. 1972), cert. denied, 411 U.S. 919 (1973), the court found no conflict where the defendant's attorney had previously represented a codefendant who at that time exonerated the defendant, but later changed his story and appeared as a government witness. If anything, the court found, the attorney's prior conversations with the witness probably helped him in cross-examination; similarly, Mr. Quarles's firsthand knowledge of Renee's prior inconsistent statement may well have strengthened, not weakened, his ability to cross-examine her. Accord, *United States* v. *James*, 505 F.2d 898, 900 (5th Cir.), cert. denied, 421 U.S. 1000 (1975). See also *United States* v. *Fannon*, 491 F.2d 129, 132 (5th Cir.), cert. denied, 419 U.S. 1012 (1974), *United States* v. *Rispo*, 460 F.2d 965, 972 (3d Cir. 1972), and *Hayman* v. *United States*, 205 F.2d 891, 893-895 (9th Cir.), cert. denied, 346 U.S. 860 (1953), for other cases holding that prior representation of a codefendant turned government witness does not in itself give rise to a conflict of interest.[6]

The defendant makes a second contention, closely related to but distinguishable from the first. He argues that Mr. Quarles should have withdrawn as his attorney in order to testify as a witness on his behalf. The defendant claims that, since Mr. Quarles was the only witness to any statements Renee made to him, he should have testified to these.

The simple answer to this contention is, once again, that, besides the defendant's bare assertions that Renee had made such statements to Mr. Quarles, there is no clear evidence that she did,[7] or if she did that they were

[6] But cf. *United States* v. *Vargas-Martinez*, 569 F.2d 1102 (9th Cir. 1978), and *United States* v. *Mahar*, 550 F.2d 1005 (5th Cir. 1977), which hold that the judge has a right to demand that an attorney withdraw in such a situation because of the potential for conflict that exists. And see *People* v. *Johnson*, 46 Ill. 2d 266 (1970), ordering a new trial for a defendant where his trial counsel had also represented a codefendant who, under an order of immunity, testified against him at trial.

[7] The defendant states that "[i]t is clear from the record that such conversation took place" but gives no specific record citation. The only

material or admissible or helpful to the defendant's case. Every able defense lawyer attempts to interview the witnesses to the alleged crime. If a defendant could later gain a new trial merely by asserting that his lawyer should have withdrawn and testified to something a witness supposedly told him, many criminal verdicts would be in jeopardy. The defendant must come forward with a considerably stronger record before such a claim can prevail.

2. *Commonwealth's Claim of Waiver by the Defendant.*

Because we hold on this record that there was no conflict of interest arising from Mr. Quarles's prior contact with Renee, we need not consider the Commonwealth's contention that the defendant's pretrial colloquy with the judge was an effective waiver of his right to conflict-free counsel. We commend the judge for discussing this matter directly with the defendant at some length. Even, as in this case, where the possibility of any true conflict is slim, the fact of such a colloquy shows solicitude for the rights of the defendant and the record thereof forestalls any later claim of ignorance or surprise.[8]

3. *Review under G. L. c. 278, § 33E.*

The defendant points to two cases, *Commonwealth* v. *Seit*, 373 Mass. 83 (1977), and *Commonwealth* v. *Ransom*, 358 Mass. 580 (1971), as precedent for use of our powers under G. L. c. 278, § 33E, to reduce the verdict to manslaughter. Both, however, are distinguishable: in *Seit*, there were no eyewitnesses to contradict the defendant's testimony that he acted in self-defense; in *Ransom*, there

---

reference we can find to any such conversation is in the judge's assumption in his pretrial remarks (*supra* at 728-730).

[8] In *United States* v. *Foster*, 469 F.2d 1, 5 (1st Cir. 1972), the Court of Appeals announced a rule requiring the District Court to discuss the risks of conflict of interest with defendants in appropriate cases. Once such an inquiry appeared on the record, the defendant would bear "a heavy burden indeed" of persuading the court that his conviction should be overturned on conflict of interest grounds.

was a general brawl with much contradictory testimony as to who was the aggressor. Here, there were four eye-witnesses whom the jury obviously believed, none of whom corroborated the defendant's claim of self-defense. We do not believe any relief under § 33E would be appropriate.

*Judgment affirmed.*