# CUSTODY OF A MINOR (No. 2).*

Hampden. November 12, 1981. — March 12, 1982.

Present: HALE, C.J., ROSE, & DREBEN, JJ.

*Minor*, Custody. *Department of Social Services.* *Parent and Child*, Care and protection of minor. *Witness*, Expert. *Attorney at Law. Conflict of Interest. Evidence*, Expert opinion, Court record.

In a proceeding to determine whether permanent custody of a minor should remain with the Department of Social Services, the financial and contractual connections between the department and a social service agency appointed by the court to monitor and report upon the needs and parental skills of the minor's natural parents did not require the judge, as matter of law, to exclude the testimony of professional persons employed part-time by the agency, on the ground that the agency was not independent of the department, where the judge had been fully apprised of the factors that might tend to create bias. [299-302]

A judge did not err in permitting a minor's foster parents to participate in a proceeding to determine whether permanent custody of the minor should remain with the Department of Social Services. [302-303]

In a proceeding to determine whether permanent custody of a minor should remain with the Department of Social Services, the fact that counsel for the minor's foster parents had an office in the same suite as the natural mother's former attorney did not, in the circumstances, require either disqualification of counsel or a mistrial. [303]

On an appeal from a judgment providing that permanent custody of a minor should remain with the Department of Social Services, there was no merit to a claim that the judge had improperly considered material which was not made available for cross-examination. [303-304]

In a proceeding to determine whether permanent custody of a minor should remain with the Department of Social Services, the judge acted within her discretion in not permitting counsel for the natural parents to interview members of a court-appointed investigative team before they had submitted the reports that the judge had ordered. [305]

In a proceeding to determine whether permanent custody of a minor should remain with the Department of Social Services, the judge's specific and detailed findings were fully supported by the evidence,

---

* See opinion on rehearing, *post* 1088 (1982). — REPORTER.

and persuasively showed the necessity of not returning the minor to her natural parents. [305-309]

Where a judgment provided that permanent custody of a minor would remain with the Department of Social Services the judge did not err in terminating an interim visiting plan that would have gradually returned the minor to her natural parents. [309]

CIVIL ACTION commenced in the Superior Court Department on October 3, 1978.

The case was heard by *Griffin*, J.

*Ellen B. Kaplan* for the parents.

*Judith S. Yogman*, Assistant Attorney General, for Department of Social Services.

*M. John Schubert*, for the minor.

DREBEN, J. The child and her natural parents appeal from a judgment of the Superior Court ordering that permanent custody of the child remain with the Department of Social Services (department) and that the visitation rights previously ordered by the court be terminated.[1] The Superior Court proceeding was an appeal from a determination on July 27, 1978, of the Juvenile Court. See G. L. c. 119, § 27, as amended by St. 1973, c. 1005.

The child's appeal (the child and her natural parents each have separate counsel) rests on the claim that the judge improperly appointed, and relied on the testimony of, an investigating team of the Judge Baker Guidance Center (Center). She argues that the Center in Springfield is not an impartial agency and is so closely allied with the department, the party seeking permanent custody under G. L. c. 119, § 27, that she was denied a fair hearing. The natural parents join in the argument made by the child, and, in addition, assert other procedural deficiencies in the proceedings,[2] claim that the decision ordering permanent

---

[1] Subsequent to the judgment, the same judge, in February, 1981, denied a motion by the natural parents for visitation. No appeal was taken from the denial of that motion.

[2] These deficiencies are: (1) the foster parents should not have been allowed to participate in the proceedings; (2) that a mistrial should have

custody in the department was made on improper standards and is unsupported by evidence of parental unfitness, and contend that the decision to terminate the interim visiting rights is counter to both departmental policy and G. L. c. 119. Our examination of the record, including the entire transcript, leads us to conclude that there is no procedural error requiring reversal, and that the careful findings and the attention given to the interests of all parties by the trial judge throughout these sensitive proceedings meet the standards expressed in recent cases to be applied when custody is taken away from natural parents. See *Bezio* v. *Patenaude*, 381 Mass. 563 (1980); *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573 (1981); *Petition of New Bedford Child & Family Serv. to Dispense with Consent to Adoption*, 385 Mass. 482 (1982). We also find no error in the order as to visitation. Accordingly, we affirm the judgment.

The procedural and substantive claims made by the child and her parents require a somewhat lengthy narrative of the facts and the court proceedings. The child was born on January 9, 1977, when her mother was not yet sixteen. At the time of her birth her mother and her father, then seventeen, lived together. They were unable to establish a stable home,[3] perhaps because of disapproval of the mother's family. The mother and child moved into the child's maternal grandmother's house, but because of differences between her own mother and herself, the mother decided in May, 1977, not to remain there. As she had no place for

---

been declared because of a conflict of interest on the part of the attorney for the foster parents; (3) that the judge improperly read certain reports which should not have been considered and that certain hearsay evidence should have been excluded; and (4) that counsel for the natural parents should have been permitted to interview the investigating staff members of the Judge Baker Guidance Center.

[3] The judge found, see note 5, *infra*, that in March, 1977, complaints were made to the police of parental neglect and physical abuse of the child and that a complaint issued that month against the child's father for breaking and entering.

both the child and herself to stay, she signed a voluntary surrender of the child to the department, but the following day called the department worker, one Ferrara, to say she had found a place with a friend. The child was returned to her mother, but a few days later the friend called Ferrara and indicated that she was no longer willing to have the mother remain with her. The child's father, after drinking, had come to her house and had struck her (the friend) in the face during an argument.

A voluntary surrender was again made, and the child was placed in foster care. A few days later, in the beginning of June, 1977, the mother insisted that the child be returned to her, and indicated she would be staying with her mother. Ferrara, who had witnessed "a lot of hostility" between the mother and the grandmother, filed a care and protection petition in the Springfield Juvenile Court. On July 7, 1977, the child was adjudged a child in need of care and protection and was placed in the temporary custody of the department. On July 13, 1977, the mother (the grandmother had surrendered the mother to the department) and the child were placed together in a foster home.

The mother did not do well in the foster home and did not provide consistent care for the child. On occasion she did not feed the child at proper times and left her in soiled diapers. She also failed to return at required times. She was accused of stealing by her mother and others. The child's mother left the foster home in November, 1977, wanting to raise the child herself without foster care. The department tried to place her and the child in Northampton, but the mother was unwilling to leave Springfield. On November 26, 1977, the child was placed with the foster parents represented in these proceedings, where she has since remained.

The department arranged a visitation program for the mother and the child. On one visit in June, 1978, the mother, contrary to regulations, took the child away. When questioned on the day of the visit by Ferrara, who was looking for the child, the mother claimed she had left her at the

department office. The child was not found until ten that evening, when her father brought her back. Visiting was suspended. On July 27, 1978, the Juvenile Court ordered the child committed to the permanent custody of the department. The natural mother sought review of this order in the Superior Court.

From June, 1978, until May, 1979, the department had little communication with the mother. In September, 1978, Ann Wisneski, a social worker, replaced Ferrara as the family worker in charge of the child's case. In May, 1979, the mother, who had obtained new counsel, filed a motion in the Superior Court seeking visitation with the child. Supervised weekly visits began on June 4, 1979. The mother and the child's father were married on July 20, 1979.

During the summer and fall of 1979, a clinical psychologist, Dr. Gentile, made a family evaluation for the department and interviewed the child, her foster parents, and her natural parents. Another clinical psychologist, Dr. Wolfe (at the Commonwealth's expense by direction of a Superior Court judge), evaluated the child and her natural parents at the request of counsel for the natural parents.

The judge appointed an attorney as an investigator in November, 1979, and his report was submitted to the court prior to a scheduled hearing on January 21, 1980. He recommended that there be a gradual plan to transfer physical custody to the natural parents. His conclusions set forth in the margin poignantly summarize the difficulties he found in this case.[4]

---

[4] *"Conclusion:*

"The writer found this to be a most difficult case to approach in an objective manner.

"There is no doubt that the child is a beautiful, loving, alert little girl, who has come to love and thrive under the care of two beautiful people [foster parents]. To take the child out of that environment would seem almost criminal.

"However, when one discusses the matter with the biological parents, the thought of denying them of the right to their child has a chilling effect.

At the hearing on January 21, 1980, the attorney-investigator was sworn, his report admitted in evidence, and the case was continued to January 30, 1980. Counsel for the department, counsel for the child and counsel for the natural parents all agreed to accept the recommendation of the investigator. The judge, however, indicated that it might be advisable to hear more evidence, particularly of the doctors, and stated that on January 30, 1980, she would hear discussion of the proposed plan and perhaps hear additional evidence in February.

At the hearing on January 30, 1980, counsel for the foster parents was permitted to file an appearance, over the objection of counsel for the natural parents. It was agreed at the hearing that the child's visits to her natural parents would be increased from two hours every other week to weekly visits from 10:00 A.M. to 5:00 P.M. every Saturday starting February 9, 1980. It was suggested by counsel for the foster parents that in addition to the counsellor chosen by and presently seeing the natural parents, the court seek a second opinion. The matter was continued to February 27, 1980.

At that hearing it was represented to the judge by counsel for the foster parents that these parents were having difficulties with the child occasioned by the more frequent and longer visits with the natural parents. As a consequence, they were requesting counselling assistance to cope with these problems. Counsel for the department suggested that the reports of Dr. Gentile which had been incorporated in the attorney-investigator's reports might be helpful to the

---

"I failed to find in my investigation:

1. Clear and convincing evidence of violence of temper, indifference or vacillation of feeling toward the child, presently.

2. Inability or indisposition to control or unparental traits of character or conduct.

"I did find, however, immaturity on the part of both natural parents, which is in need of, but is developing slowly toward, *improvement* [emphasis in original].

"These youngsters have made a real effort and there has been a 'change of circumstances' in that they have married, they are living together and for the first time have a home to bring the child to."

judge in this transition period, and they were admitted in evidence over the natural mother's objection. After the social worker, the foster mother and the natural mother testified, it was agreed that Dr. Gentile would again see the child. The judge's findings as to the problems occasioned by the longer and more frequent visits in February, 1980, are set forth in the margin.[5]

The next hearing took place on April 4, 1980. After Dr. Gentile testified, the judge "determined that in [the child's] best interest it was necessary to speed up the process of reaching final resolution of the ultimate question of [the child's] custody" (quote from document referred to in note 5, *supra*). Two overnight visits were scheduled. The court determined, based in part on Dr. Gentile's testimony, that it would be helpful to have the visits monitored so that the interaction of the child with her foster and natural parents could be observed before, during and after the visits. The judge was also concerned about the additional stress on the mother of having a new baby and the help she might need in

---

[5] The following excerpt is taken from the judge's "Findings, Rulings and Order for Judgment" filed on August 29, 1980:

"At the February 27, 1980, court hearing, the court learned that [the child] was exhibiting certain regressive behavior which reflected extreme anxiety on her part as a consequence of the weekly separations from her foster parents. [The child] resisted leaving the [foster parents'] home on many occasions. She would cry and refuse to leave, sometimes resulting in her being physically carried to the car. Upon her return from visits, she would act glad to be home. However, she would be more active than usual and get into much mischief. If things did not go her way, she would throw herself on the floor and kick and cry. Although [the child] had been completely daytime toilet trained for several months, she began to wet her pants during the day, the frequency of such wettings reaching as many as five or six times a day by the end of February. At times [the child] became difficult to control. These behaviors, unusual to [the child], would decrease as the week progressed from her return from the home visit to the [natural parents]. [The child] refused to discuss these visits with the [foster parents] or later with Dr. Gentile.

"Out of concern for [the child's] well-being, it was agreed that [the foster mother] would arrange weekly visits with Dr. Gentile in addition to the home visits, and that Dr. Gentile would report at the next scheduled hearing."

developing parental skills. The mother had become preg-
nant and expected the baby in September.

Counsel for the department and for the foster parents
suggested that the Judge Baker Guidance Center (Center) in
Springfield could perform these functions. Counsel for the
child suggested that the Child Guidance Clinic would be
preferable. He considered that the Center staff would be
biased, as the child's pediatrician was on the staff there and
was in favor of her remaining with her foster parents.
Counsel for the department and counsel for the foster
parents indicated, however, that there would be a long
waiting list at the Child Guidance Clinic. The judge asked
Dr. Gentile if he felt the Center had the necessary staff to
assess the parental skills of the natural parents and the inter-
action between them and the child. He indicated that he
thought so.

Thereupon, the court decided to have the Center assess
the natural parents' parental skills, determine the effects on
the child of the home visits and recommend an appropriate
program for the natural parents, if necessary. The next
scheduled court hearing was May 2, 1980.

Prior to that hearing, on April 14, 1980, the attorneys,
other than counsel for the department (who could not be
present) met with members of the Center. The coordinator
of the Center wrote a letter to the court dated April 28,
1980, suggesting that psychological testing of the parents be
performed, stating that "[t]he members of the Baker team
view this case as a particularly sensitive one and are eager to
present as complete an evaluation as possible." The letter
also indicated that testing was time consuming and might
extend the evaluation process by about two months.

At the May 2, 1980, hearing, the judge ordered the addi-
tional testing suggested by the Center. The need for addi-
tional testing and the independence of the Center were dis-
cussed. The focus of the hearing revolved, however, on
events of April 19, 1980, a day of one of the child's visits to
her natural parents' home. That day was not uneventful.
As a result of a visit that night by the mother to a neighbor

who also happened to be a department social worker, the child's social worker, Ann Wisneski, cancelled the next scheduled visit, which was to have been an overnight visit.[6] The judge's account, see note 5, *supra*, of the April 19 incident is set forth in the margin.[7]  The judge continued to be concerned with the effect of the visits on the child, and the foster mother testified as to increased wetting by the child. The visits, however, and their monitoring were to continue.

The hearings resumed on July 17, 1980,[8] and hearings were also held on July 21, 24, 25, 30, and 31.  The team from the Center, other psychologists, the department workers, the child's pediatrician, and the natural parents all testified.  On August 29, 1980, a judgment entered ordering that permanent custody remain with the department and that the rights of the natural parents to visit be terminated. Subsequently, on October 16, 1980, the order as to visitation was clarified so as to provide that the visiting rights of

---

[6] Wisneski also wrote a memo, introduced in evidence, to counsel for the department, to counsel for the child, and to the Center, as well as to other representatives of the department, which included a report of physical abuse of the mother by the child's father.  The neighbor's testimony at the hearing on April 4, 1980, did not include any such statement by the mother.

[7] "On April 19, 1979, during one of [the child's] home visits, [the mother] and [the father] apparently had an argument in [the child's] presence, during which both [the mother] and [the father] cried.  The mother quieted things down and [the father] left.  Later that evening, after [the child] was gone, [the father] returned.  He had been drinking. [The mother] fled the house out the back door, and ran through four backyards, jumping over a fence to get to a neighbor's back door.  She did not personally know the neighbor.  [The mother] was then three months' pregnant.  She told the neighbor that [the father] had been drinking and she left to avoid an argument.  She told the neighbor she had been beaten in the past.  She also said that [the father] had yelled and screamed at her; that he didn't care what she did about the new baby; that she could abort or whatever.

"The neighbor left her home about two hours later.  [The mother] walked with the neighbor to her car hidden under a blanket and hid in the back seat of the car.  The neighbor dropped [the mother] near a friend of [the mother's] sister where she could stay for the evening."

[8] There had been an additional untranscribed hearing in May.

the natural parents "under the interim plan previously ordered by the court are terminated."

1. *Claim that the child and her parents were denied a fair hearing because the judge relied on evidence of a party in interest.* The child claims that reliance by the judge on the testimony of the professional staff of the Center rather than on psychiatrists or psychologists independent of the department amounts to "fundamental unfairness." Her natural parents claim that the appointment of the Center "unduly prejudiced the integrity of the proceedings." They claim that the denial by the judge of their motion to exclude testimony and reports of the staff of the Center was erroneous.

We note first that "the bias of a witness goes only to his credibility and is not a reason for exclusion of his testimony." *Assessors of Pittsfield* v. *W.T. Grant Co.*, 329 Mass. 359, 361 (1952). Nevertheless, we recognize that an additional measure of caution is in order because of the extraordinary influence of the department in cases such as the present and its "vastly superior resources for investigation and presentation of its case." *Petition of the Dept. of Soc. Servs. to Dispense with Consent to Adoption*, 384 Mass. 707, 712 (1981), quoting from *Department of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1, 4 (1979). See, for example, Administrative Regulation 2-80, promulgated March 24, 1980, by the Administrative Justice of the District Court Department, Standard 3.04, and commentary, second par.,[9] and

---

[9] Standard 3.04 reads: "*Appointment of Investigator.* Upon the issuance of a precept and order of notice, G. L. c. 119, § 24 requires that 'the court shall appoint a person qualified . . . to make a report to the court under oath of an investigation into conditions affecting the child . . . .'"

Second par. of the commentary states:

"Although an agent of the Department of Social Services is qualified to make a report, and Department of Social Services social workers may be appointed as investigators in some cases, they should not be named investigators in cases in which the Department of Social Services is the petitioner or in which temporary custody of the child is placed in the

the discussion in Cowin, Standards for Care and Protection Proceedings, 66 Mass. L. Rev. 77, 82 (1981).

We consider the claims, therefore, with an "extra measure of evidentiary protection." See *Custody of a Minor (No. 1)*, 377 Mass. 876, 884 (1979). First, they must be assessed in relation to the function that the Center's professional staff were to perform. At the time of the Center's appointment by the judge, the parties, including the department, were in the process of speeding up visitation in order to carry out the plan, proposed by the independent attorney-investigator, of gradually returning the child to her natural parents. There is no indication that the department was in any way trying to obstruct this plan on April 4, 1980, when the judge determined that it would be helpful to have some monitoring of the child's visits to assess the parental skills of her natural parents and the effects on her of the home visits.

The discussion at the April 4, 1980, hearing as to what monitoring should be performed, and by which persons or agencies, indicates that the department was not viewed as an adversary for this purpose. The judge and the parties at first seriously considered having Dr. Gentile perform these tasks. When that proved to be a problem in terms of timing, the judge suggested that Ann Wisneski, the child's department social worker, could take a more active part. Counsel for the parents responded that "[t]hat is appropriate." In fact, counsel for the parents, in opposing the bringing in of a new agency, stated, "But we do have the department worker . . . who has an ongoing relationship there, and I think is as qualified as any of the other agencies."

The judge, however, wanted to find out whether additional help for the natural mother was needed or could be

Department of Social Services. Appointment of a Department of Social Services worker in such instances would present a conflict of interest, as the investigator appointed by the court must be impartial."

We point out that the appointment in the Superior Court was not pursuant to G. L. c. 119, § 24, and that the judge had already appointed one impartial person, the attorney-investigator. The Center was an additional appointment.

provided, especially in view of her pregnancy. It is in this context that a team evaluation by an outside agency was considered appropriate. The choice of the Center was made because of the long waiting list of the other agency in Springfield suggested by the parties, the Child Guidance Clinic. Although the judge intended to appoint an impartial agency, it is apparent that the function of the Center's team was not to act as an independent arbiter to review different plans proposed by the department and the natural parents but, rather, to monitor and assess the gradual return plan of the independent investigator-attorney which had been accepted by both.

We next look to the financial and other connections of the department with the Center and its staff. The coordinator of the Center was closely examined at the hearing of July 17, 1980. She testified that the Center was under contract with the department, and with other public agencies under contract with the department, to assess reports of child abuse and neglect under G. L. c. 119, § 51A. She testified that the contents of the assessments were wholly within the control of the investigating team, and that she had no authority to override their assessments. Probably all of the Center's funds come from the department, or agencies under contract with it, and matching Federal funds. The department is housed in the same building as the Center and when the department employees go to an annual conference, the coordinator has supervisory responsibility for the social workers of the department.

The testimony sought to be excluded in this case is not the testimony of the coordinator who had, on occasion, these supervisory duties over department workers but is, rather, the testimony of three experts, namely, Dr. Bennett, a psychiatrist and psychoanalyst, and Drs. Hyman and Grey, two psychologists. These three experts work part-time with the Center. Dr. Bennett is a consultant for the Center for a maximum of seven hours a week. Dr. Hyman works there five hours a week, and Dr. Grey works there two and a half days a week.

All three have strong academic and professional credentials and are obviously well qualified as experts. We consider it contrary to the ultimate aim of these proceedings, that is, the determination of the best interests of the child and the fitness of her parents, to require that the most recent examination of the interaction of the child and her parents and the evaluation of their parental abilities[10] be excluded as matter of law because of the Center's financial and other connection with the department.

The bias, if any, of the investigative team was fully revealed. The judge in this case was an experienced fact finder and had the opportunity to observe as witnesses each of the experts who filed a report. Each was subjected to vigorous cross-examination by both counsel for the child and by counsel for the natural parents. See *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 384 Mass. at 716, first sentence of n.17. In these circumstances, while it would have been preferable at least from the point of appearance, see *id.* at 712, for the Center to have been wholly independent of the department in view of the judge's request for an impartial evaluation, we think it plain that the denial of the motion to exclude the testimony and reports of the staff of the Center was not erroneous. There was here no requirement that there be a report from a wholly independent agency, and the judge was fully apprised of the factors which might tend to create bias. Moreover, as will be seen in part 6, *infra*, contrary to the contention of counsel for the child, the evidence from the Center was far from the sole evidence of the parents' unfitness.

2. *Participation by the foster parents.* The claim of the natural parents that the judge erred in allowing the child's

---

[10] The coordinator described the examination as "a very fancy kind of evaluation [which] [w]e don't have the time or the luxury to do . . . for every case." Dr. Hyman administered psychological tests to the natural mother on three days and to the father on three days. Dr. Grey observed the child with the natural mother (or parents) on three separate occasions and the child with the foster mother (or parents) on three occasions.

foster parents to participate in the proceedings is foreclosed by *Care and Protection of Two Minors*, 12 Mass. App. Ct. 867, 869 (1981). As we said in that opinion, "In this type of case; a court may gain great assistance from such participation, although no constitutional right to such participation may exist."

3. *Claim of conflict of interest on the part of counsel for the foster parents.* Mary E. Hurley, counsel for the foster parents, had an office in the same suite as the mother's former attorney who withdrew from the case in May, 1979. This information had not been disclosed to the mother. The matter was brought up at the July 31, 1980, hearing when counsel for the natural parents moved for a mistrial. Ms. Hurley testified that all the attorneys sharing the suite are individual practitioners, have their own offices and files, their own checking accounts, and do not have access to the files of the others or know their clients. She never discussed the case with the mother's former attorney and had not been aware that he had had anything to do with the case until she was told of such fact by her clients. At that time the attorney was no longer representing the mother.

In these circumstances, the judge was not required to disqualify Ms. Hurley or grant a mistrial. See *Commonwealth v. Wright*, 376 Mass. 725, 730-731 (1978). See *id.* at 732, quoting with approval from *United States v. Donatelli*, 484 F.2d 505, 507 (1st Cir. 1973) (the "defendant cannot rely on speculative harm caused by speculative confidential information to show that he was deprived of his constitutional rights at trial"). Cf. MBA Committee on Ethics, Opinion No. 76-19 (1976), dealing with duty of disclosure by both attorneys to both clients when lawyers sharing an office suite consider *concurrent* representation of opposing parties.

4. *Question relating to the record of Juvenile Court proceedings.* At the hearing of February 27, 1980, the judge was concerned with the current situation of the child. In discussing the admission of Dr. Gentile's reports, the judge stated, "Anything that I take today is not . . . to have any-

thing to do with the final determination of this matter. What I'm looking for today is to see how we moved along on this case. I'm not going to make a final adjudication." Dr. Gentile's reports on various dates were submitted, and counsel for the natural parents asked that only the second one be appended to the attorney-investigator's report. The judge responded: "The original one which was given me was September, 1977. Of course, if I recall correctly, because I read it before in the file — it's part of the Juvenile Court record and I think —."

On the basis of this one statement, counsel argues that the judge improperly considered the entire Juvenile Court record, including reports and other material, the sources of which were not revealed nor made available for cross-examination. Although counsel refers, in a footnote to her brief, to a motion to strike made on August, 1979, at a pretrial conference, neither that motion nor the record of the pretrial conference is before us. Accordingly, the only claim before us is the objection taken on February 27, 1980. This concerned Dr. Gentile's reports. Since Dr. Gentile was subjected to cross-examination and his reports were part of the investigator's report, the claim is without merit. See G. L. c. 119, § 21; *Custody of a Minor (No. 2)*, 378 Mass. 712, 723 (1979).

In any event, counsel's footnote reveals that the trial judge denied the motion "because it was unnecessary in that prior records were not automatically a part of the Superior Court *de novo* trial." The footnoted material buttresses the conclusion that the judge did not consider the record in her decision. The judge stated on February 27, 1980, that the purpose of considering any evidence at that time was limited to assessing the current situation of the child. Thus, even if the judge's statement on February 27, 1980, as to the Juvenile Court record is construed to mean that she considered the entire record at that time, there was no error.[11]

---

[11] We do not consider whether it would have been error to consider the material for purposes of the final decision, particularly since the material is not in the record before us.

5. *Interviewing of court-appointed experts.* At the hearing of May 2, 1980, counsel for the natural parents complained that Dr. Grey of the Center had been unwilling to speak to her without court approval even though she had obtained authorization from her clients. The judge's decision not to permit each counsel separately to interview the witnesses at this stage of the proceedings, which was prior to the time the reports ordered by the judge had been submitted, was within her discretion.

6. *Legal standards and evidence supporting the ruling on the merits.* The natural parents argue that the judge did not treat seriously the burden of proving parental unfitness and based the decision only on her perceptions of the relationship of the child with her foster parents, their ability to provide for the child, and the negative effects of removing the child from their home. They urge that some unfitness of the parents must be shown and that such potential handicaps on the part of the parents must be such as to place an exposed child in danger.

The Supreme Judicial Court has recently had occasion to state the standards applicable in these cases. See *Bezio* v. *Patenaude*, 381 Mass. 563 (1980); *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573 (1981); *Petition of New Bedford Child & Family Serv. to Dispense with Consent to Adoption*, 385 Mass. 482 (1982). See also *Custody of a Minor (No. 1)*, 377 Mass. at 882, and *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 641 (1975). We need not repeat that discussion here, but recognize that the following principles apply: "'[T]he critical question is whether the natural parents are currently fit to further the welfare and best interests of the child.'" *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. at 589. "[N]atural parents may not be deprived of the custody of their minor children in the absence of a showing that they 'have grievous shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard' or 'unless some

factor such as lengthy separation and a corresponding growth in the ties between the child and the prospective adoptive parents indicate[s] that the child would be hurt by being returned to the natural parents.'" *Id.* at 1175, quoting from *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. at 642, 646. There is no "per se rule that prospective adoptive foster parents, who have become a minor child's psychological parents, shall automatically prevail in a custody dispute over a natural parent." *Id.* at 591 n.16; see also 590 n.15.

In sum, the best interests of the child test and the parental unfitness tests are both to be considered, the tests are not separate, but "cognate and connected." *Little Wanderers*, 367 Mass. at 641. *Bezio v. Patenaude*, 383 Mass. at 576. *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. at 592. *Petition of New Bedford Child & Family Serv. to Dispense with Consent to Adoption*, 385 Mass. at 489.

We think the judge's findings and rulings meet these guidelines and, keeping "in mind that the . . . judge was in the best position to determine the weight of the evidence and credibility of the witnesses," *Petition of New Bedford Child & Family Serv. to Dispense with Consent to Adoption*, 385 Mass. at 488-489, we think her findings and rulings are not only not clearly erroneous, *id.* at 489, but are "amply justified by the totality of the evidence." *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 371 Mass. 651, 656 (1976).

It is true that there was no evidence of current physical abuse or neglect of the child or of an inability on the part of the natural parents to provide food, clothing, and shelter for their daughter. It also appears that the natural parents eagerly wish to care for the child. However, even the most favorable expert for the natural parents, Dr. Wolfe, who had not seen the child or the natural parents during the period of increased visits, stated on cross-examination that the natural mother's self image ("sense of self") was only

"fair" and that the "special meaning" to her of obtaining the child was to improve her own (the mother's) sense of self. See *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption, post* 936, 937 (1982) ("mother has 'high expectations of being provided emotional gratification from the child,' but 'frustration of these needs would have a destructive influence on her mothering function'"). Asked if the mother could provide the kind of parental care which would promote normal, healthy emotional development of the child, Dr. Wolfe answered, "It is possible. Whether it would happen, I don't know." Nor did he know whether it was more probable than not. The same answer was given as to the child's father's parental abilities.[12] His opinion as to the effect of removing the child from the foster parents was: "That it would not be a good thing for [the child]." The foregoing testimony was from the expert most favorable to the natural parents.

Dr. Gentile, who had seen the child in 1977, had made an evaluation in the summer of 1979, and had seen the child during the period of increased visits with her natural parents, testified that much of the natural mother's attachment to the child is because she receives emotional support from the child, and that she is not able to emotionally sustain the child. It was his opinion that even if the child could not stay with the foster parents, she would be "at risk returning to her biological parents," and that her mother does not have the "ability to care and protect and provide" for the child. "I feel there will be an arrest of her emotional development because . . . she will not receive the emotional support that she should have." His October, 1979, report stated, "[R]euniting them would serve merely as a means of

---

[12] Dr. Wolfe also said, in regard to the mother, "I have seen what I feel to be definite potential shortcomings that could get in the way of being an adequate parent, but they might not." When asked whether the shortcomings of the mother put the child in jeopardy, he answered, "in terms of her emotional development, they could." He also indicated that if the mother did not have psychotherapy, "it would depress the probability" of the child's needs being met.

attempting to preserve [the mother's] sense of self, with disastrous consequences to [the child]."

As the judge found, "the reports and testimony of the members of the Judge Baker team echoed Dr. Gentile's conclusion that the natural parents are not capable of providing [the child] with the nurturance, support, love and structure required to insure her normal, healthy emotional growth; that they are unable to place her needs on a par with their own or respond to her needs in an empathic way." The conclusions of the professional psychologists and psychiatrist were supported by particular facts, including the history of the mother's emotional deprivation and sexual abuse by her father and sexual harassment by her stepfather, and by testimony as to the child's father, including his problem with the law, and were confirmed, in the opinion of Dr. Hyman, by the battery of psychological tests given to both natural parents. We need not recount the judge's careful findings based on hundreds of pages of testimony often expressed in the jargon of the profession detailing why the conclusions were reached.

In addition to the evidence of the psychologists and psychiatrist of the parents' unfitness and the testimony of the experts who the judge found "were unanimous that it was in [the child's] best interest" to remain with the foster parents, the judge also had evidence, some of which was previously recounted, of the effect on the child of the visits and consequent separations from her foster parents, her regression, and the anxiety she was experiencing and the unusual clinging to her foster parents. The judge saw at first hand both the natural parents and the foster parents, who testified that they would like to adopt the child. The judge also heard from the child's pediatrician.

Although as one of the experts from the Center (Dr. Bennett) wrote, "one would like to see [the mother] get another chance,"[13] the judge properly focused on the best interests

---

[13] Dr. Bennett, too, despite his sentiments, concluded that the child would be "at emotional risk" if she were returned to her biological parents and was against such a solution.

of the child and concluded that the parents are unfit "in relation to the furtherence of this particular child's welfare." *Custody of a Minor*, 383 Mass. 595, 601 (1981). Her "specific and detailed findings" which are fully supported by the evidence, demonstrate that "close attention has been given the evidence" and "that the necessity of removing the child from . . . her parents has been persuasively shown." *Custody of a Minor (No. 1)*, 377 Mass. at 886.

7. *Termination of interim visiting plan.* Since the judge ruled that custody was to remain in the department, the interim visiting plan which was to result in a gradual return of the child to the natural parents was terminated. This was not error. The denial of the motion for other visiting rights is not before us.

*Judgment affirmed.*